JOSEPH H. WOOD *et al.*, Plaintiffs-Appellees, *v.* MOBIL CHEMICAL COMPANY, Defendant-Appellant.

Fifth District    No. 76-183

Opinion filed July 8, 1977.

Wagner, Bertrand, Bauman & Schmieder, of Belleville, and Armstrong, Teasdale, Kramer & Vaughan, of St. Louis, Missouri (Bernard H. Bertrand, Frank H. Gundlach, and Fred Leicht, Jr., of counsel), for appellant.

Hillebrand, Cook & Shevlin, of East St. Louis, and Thomson & Thomson, of Jacksonville (Bruce Cook and John Mann, of counsel), for appellees.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

This action was brought in the circuit court of St. Clair County by plaintiffs, Joseph and Ercelia Wood, against defendants, Mobil Chemical Company (hereafter Mobil), Towmotor Corporation (hereafter Towmotor) and DeWalt Fry, to recover damages for the claimed exposure of Joseph Wood to carbon monoxide from which he allegedly suffered brain damage. A third-party complaint by Mobil and Towmotor

against B. N. Transport, Inc., and the plaintiffs' complaint against DeWalt Fry were dismissed by the trial court. Following a jury trial, verdicts were returned for Towmotor and against plaintiffs and for plaintiffs and against Mobil. The jury assessed damages at $525,000 for Joseph Wood and $75,000 for his wife. The trial court entered judgment on the verdict from which Mobil now brings this appeal.

On appeal, Mobil contends that the trial court erred in denying its motions for a directed verdict and for a judgment *n.o.v.*; that the trial court committed certain trial errors and erred in giving certain instructions; and that the damages assessed by the jury were excessive.

The evidence at trial showed that on October 18, 1971, Joseph Wood, who was then 41 years old, worked as a truck driver and loader for B. N. Transport, Inc. On that date Wood was sent with a tractor-trailer to pick up a truck load of Hefty Bags, a product produced by Mobil at its Jacksonville facility. The trailer was a 40-foot trailer which was open at the end. The tractor-trailer was driven to Mobil's Building 11, a large storage building which had truck loading doors. These doors were designed in such a manner that a trailer may be backed directly against the building so that the interior of the trailer may become annexed to the interior of the building. Rubber cushions around the border of the loading doors served as a gasket between a trailer and the building to seal out cold weather. Wood's trailer was centered and backed tightly against the building opening. A bridgeplate was then laid down, to serve as a ramp between the building and the trailer. The tractor was then detached from the trailer and a co-worker of Wood drove the tractor away leaving Wood to load the trailer.

Wood loaded the trailer with the assistance of Mobil's fork lift driver DeWalt Fry. Fry drove skids loaded with Hefty Bag boxes directly into Wood's trailer with the fork lift. Fry placed each skid near Wood, who then stacked each box onto the trailer. Next to Wood's trailer, was another trailer in which Wayne Bunfield was stacking boxes in the same manner as Wood. Fry would alternately bring a pallet of boxes to Wood's trailer and then to Bunfield's trailer. When Fry would bring a load into either trailer, he entered front first and after placing the skid, he would back out. The fork lift was in Wood's trailer no more than 20 seconds with each load.

The fork lift which Fry operated on that day was powered by a four-cylinder, internal combustion, gasoline engine. Mobil's fork lift drivers preferred its electric fork lifts because they were newer and did not produce exhaust fumes; however, the electric fork lift Fry attempted to use that day was inoperative. The fork lift that was used emitted exhaust fumes containing carbon monoxide from its rear. This was the only source of carbon monoxide in or around Wood's trailer. There was testimony that the percentage of carbon monoxide in exhaust fumes can

substantially increase if a gasoline engine is not properly maintained. Despite Mobil's schedule which required weekly maintenance of their fork lifts due to their heavy usage, the fork lift Fry used had not been serviced for two months prior to the day of the incident.

Approximately one half hour after the loading began, Fry saw Wood fall in the trailer. By then, the fork lift had entered the trailer about 10 to 20 times and the trailer was one-fourth to one-third loaded. Fry went to Wood and found him lying unconscious on the trailer floor. Others came to Wood's aid, including Marilyn Riggs, a nurse at Mobil, and an ambulance was called. Cornelius Sparrow, a truck driver with B. N. Transport, testified that when he saw Wood lying unconscious in the trailer, Wood's color appeared "normal" and Sparrow did not notice any unusual accumulation of exhaust fumes in the area. Nurse Riggs did not testify. After Wood had fainted, he remained in the trailer for 20 to 45 minutes until he was taken away by the ambulance.

Wood was taken to a hospital where he was examined by Dr. Auner. Auner described Wood as slightly stuporous and found Wood's face to be both flushed and cynotic. After taking a history of the patient, Auner diagnosed Wood as suffering from carbon monoxide intoxication and he ordered that the oxygen that was being administered to Wood be continued. At trial, Auner affirmed the correctness of the diagnosis and stated that in his opinion Wood had suffered carbon monoxide intoxication. He further stated that at the time of the incident he did not give Wood a blood test to verify the diagnosis since "the condition was apparent" and Wood was "improving rapidly."

On the day following the incident, October 19, Wood was discharged from the hospital by Dr. Auner. On October 25, Wood returned to work. While there, Wood witnessed a minor accident with which he was not involved but which "pretty well shook up" him and made him feel unable to "safely drive without seeing a doctor."

Wood first visited Dr. Auner who found Wood appearing "extremely nervous." Auner was unable to say whether this condition was causally related to the carbon monoxide intoxication. Wood then visited his own family physician, Dr. Hyk. Hyk testified by deposition that Wood appeared tired, nervous and very irritable. Physical examination showed Wood's vital signs to be normal. Based on the history and character of the symptoms, Hyk determined that the carbon monoxide intoxication had affected Wood's nerve and brain cells. Hyk then prescribed a drug treatment to attempt to improve the condition. Thereafter, when he found the condition unimproved, Hyk consulted with a neurologist and eventually he sent Wood to a psychiatrist, Dr. Zilinskas.

Zilinskas testified that he ordered that Wood be admitted to a hospital for a full battery of physical, neurological and psychiatric examinations.

These showed that Wood was suffering from extreme nervousness, anxiety and depression. He was also found to have poor concentration and attention span, inability to do simple mental tasks, poor abstract thinking, and difficulty in expression and simple daily functioning. Zilinskas' diagnosis of the condition was nonpsychotic, organic brain syndrome in which the brain damage was slight but permanent. Etiologically, Zilinskas determined that the condition was caused by Wood's carbon monoxide exposure and he stated that he "could find no other cause." Zilinskas stated that Wood had responded well to treatment and that he was less depressed and less anxious. In his opinion Wood would be able to hold a simple menial job if trained to do so but that Wood will not be able to drive a truck again.

Ercelia Wood testified that her husband's personality "completely" changed since the date of the incident. They no longer had a husband-wife relationship and he became "more like one of the kids." Her husband no longer shared in decision-making, nor in the discipline of their three children. Although he had built their house, since the date of the incident he could no longer repair things around the home. Moreover, she described him as "not interested" in things around the home, as having a poor memory and as sometimes being "scared" or depressed, all of which were in contrast to his nature before October 18, 1971.

Dr. Bornstein, a psychiatrist testifying on behalf of Mobil, stated that his examination of Wood showed him to be cooperative, logical, somewhat depressed but not anxious or confused, and having a normal attention span and a good memory. Bornstein stated that in his opinion there was no evidence of any organic brain damage and no indication of aphasia. Bornstein described Wood as having a depressive neurosis of uncertain cause. He also stated that Wood's low sex drive may have been partially due to a medication Wood was taking. Kenneth Imhoff, a psychologist testifying for Mobil, stated that tests he administered to Wood showed no organic brain impairment, an average intelligence, but that there was some anxiety and neurotic or characterological traits.

In rebuttal, Uldine Beck, a psychologist, testified that a certain aphasia test she administered to Wood showed a visual-motor organicity.

On appeal the first issue raised by Mobil is whether the trial court erred in denying Mobil's motion for a directed verdict and its later motion for judgment notwithstanding the jury's verdict. In its analysis of the heretofore related facts, Mobil contends that the trial court so erred due to the "complete absence" of any evidence of the presence of sufficient carbon monoxide to have caused any injury to Wood.

■■ In the oft-cited case of *Pedrick v. Peoria & Eastern R. R. Co.*, 37 Ill. 2d 494, 229 N.E.2d 504, the court held that in jury trials:

> "In our judgment verdicts ought to be directed and judgments

*n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.)

Viewing the evidence thusly we find ample evidence of the presence of carbon monoxide sufficient to have caused injury to Wood.

No authority need be cited for the settled principle that facts may be proven either by direct or circumstantial evidence. The fact that there had been sufficient carbon monoxide present was shown by qualitative, circumstantial evidence. Dr. Auner, a disinterested witness, diagnosed Wood's condition as carbon monoxide intoxication immediately after the time of the incident. In his judgment the nature of this condition was apparent based on his observation of Wood's bright red-blue skin coloration and stupor. No other evidence was presented explaining this observed condition nor Wood's initial loss of consciousness. In addition, it was undisputed that Mobil's fork lift was the only source of carbon monoxide during the time of Wood's exposure thereto. For approximately 30 minutes prior to Wood's loss of consciousness, the fork lift was continuously in and around the area in which Wood was working. The evidence also tended to show that the percentage of carbon monoxide in the exhaust fumes of the fork lift may have been significantly increased by the lack of maintenance of the fork lift for two months prior to the incident. Moreover, the evidence showed that the area in and around Wood's trailer was such that the fork lift's exhaust fumes would remain stagnant in the atmosphere from which Wood drew his breath. This evidence must be measured against the lack of any evidence showing sufficient ventilation which would force out or dilute the toxic gas to which Wood was allegedly exposed.

That no one else in the immediate area of the trailer suffered the same ill effects as Wood, that Dr. Auner did not administer a blood test to scientifically prove Wood's carbon monoxide intoxication, and other like points which Mobil presents in support of its contention, when viewed against all the evidence cannot be said to have so overwhelmingly favored Mobil so as to have required a directed verdict or a judgment *n.o.v.* To the contrary, the evidence gave rise to a reasonable inference that there existed a sufficient quantity of carbon monoxide to have intoxicated Wood.

Mobil next contends that the trial court erred in instructing the jury on circumstantial evidence (Illinois Pattern Jury Instructions, Civil, No. 1.03 (2d Ed. 1971)). Mobil argues that the record shows that there is an absence of any circumstantial evidence introduced. In light of the

previous discussion it is clear that this argument is wholly without merit and accordingly we find no error in the instruction.

Mobil further contends that the trial court erred in giving plaintiffs' Instruction No. 10 (IPI Civil No. 5.01) which stated that:

"If a party to this case has failed to produce a witness within his power to produce, you may infer that the testimony of the witness would be adverse to that party if you believe each of the following elements:

1. The witness was under the control of the party and could have been produced by the exercise of reasonable diligence.

2. The witness was not equally available to an adverse party.

3. A reasonably prudent person under the same or similar circumstances would have produced the witness if he believed the testimony would be favorable to him.

4. No reasonable excuse for the failure has been shown."

This instruction was directed at Mobil's alleged failure to produce Marilyn Riggs as a witness. Riggs, at the time of the incident, was a Mobil nurse who administered first aid to Wood while he was still laying unconscious on the trailer floor.

Initially we note, the failure to produce a witness of comparative importance is open to a negative inference against both parties; however, the particular strength of the inference against either party depends upon the facts and circumstances of the case. (See Wigmore, Evidence §288 (3d ed. 1940).) Before giving an instruction on the inference, a trial court must first make a preliminary determination that a party would in all likelihood produce the witness under the facts and circumstances unless his testimony would be unfavorable. (*Feigl v. Terminal Railroad Association*, 30 Ill. App. 3d 55, 332 N.E.2d 416.) In the case at bar, Mobil disputed the testimony of Dr. Auner that Wood suffered from carbon monoxide intoxication at the time he lost consciousness. Particularly, Mobil introduced the testimony of Sparrow who testified that at the time he observed Wood laying in the trailer, Wood's skin coloration appeared normal. In contrast, Auner stated that when he examined Wood at the hospital, Wood's coloration was bright red-blue. Nurse Riggs' testimony would have been equal, if not superior, to that of Sparrow on this issue, since by training and responsibility she should have made a more deliberate and detailed examination of Wood. Thus it could be reasonably inferred that Mobil would likely have produced Riggs unless her testimony would be unfavorable to it. However, before Wood could be allowed to take any benefit from judicial comment on the negative inference, there must be some evidence in the record that Riggs was under the control of Mobil and that Riggs was not equally available to

474

Wood. (*Goshey v. Dunlap*, 16 Ill. App. 3d 29, 305 N.E.2d 648; *Hoff v. Yellow Cab Co.*, 53 Ill. App. 2d 333, 203 N.E.2d 8.) Without such evidence, it would be reasonable to suppose that if Wood thought that the testimony of Riggs were of such importance as to warrant comment, then Wood would have called Riggs as his own witness.

■■■ Here there is no evidence in the record that at the time of trial, nearly four years after the incident, Riggs was still employed by Mobil. Nor was there any evidence that Riggs was not equally available to Wood as to Mobil. Rather the record shows that both parties were in possession of Riggs' address at the time of trial. On these bases, therefore, the giving of the instruction over objection was error. In closing argument after advising the jury the instruction would be given and that the missing person referred to was Marilyn Riggs the plant nurse at Mobil, plaintiffs' counsel, over the objection that there was no evidence that Marilyn Riggs was presently employed by Mobil, which objection the court overruled, advised the jury that she was the plant nurse who should have been brought to the trial to dispute the evidence of carbon monoxide intoxication. The trial court again erred in allowing counsel to make that argument to the jury and it is only because there was never any intimation that Mobil was attempting to conceal or concealing the truth from the jury that we consider the giving of the instruction and the argument harmless error.

Mobil next contends that the trial court erred in giving the jury plaintiffs' instruction No. 14 which was a modified version of the first paragraph of IPI Civil No. 12.04 on concurrent negligence of a third party other than the defendants. Actually, there was no evidence of any concurrent negligence of any third party. The instruction as given was designed to adopt the standard instruction to the facts of the case which involved two defendants, Mobil and Towmotor, and in which the plaintiffs' theories against Towmotor involved both negligence and strict products liability. The instruction as given over the objection of both defendants that it was not a proper statement and that it was confusing, read: .

"More than one person may be the blame for causing an injury. If you decide that the defendants were, or either of them, negligent, or that there existed in the fork lift an unreasonably dangerous condition by the defendant's Tow Motor Corporation's failure to warn, and that the negligence of one or both of the defendants, or the condition of the fork lift were a proximate cause of injury to the plaintiff, it is not a defense that some third person, or the other defendant may also have been to blame."

■■ Mobil argues that this instruction did not properly distinguish between the different alleged acts or omissions of each defendant or the

different theories of liability upon which this case was based. While we consider the instruction should not have been given, and agree that in view of the absence of evidence of negligence or blame of a "third person" it is confusing, we cannot say that the instruction was responsible for the absence of a verdict against Towmotor and the sole verdict being against Mobil. Instructions are to be considered as a whole and a deficiency in one instruction may be cured by another. (*Ruggiero v. Public Taxi Service, Inc.*, 16 Ill. App. 3d 754, 306 N.E.2d 567; *Cole v. Brundage*, 36 Ill. App. 3d 782, 344 N.E.2d 583.) We find that the other instructions given were such as to have adequately charged the jury and to have cured any deficiency in the inartful modification of the instruction at issue.

■■ Next Mobil contends that the trial court erred in giving the jury non-IPI plaintiffs' Instruction No. 39 which states:

"If you find for the plaintiffs against one or both of the defendants, it is not a defense that a lack of care by a physician may have aggravated the injury. The law regards an injury which is aggravated by the care of a physician as a part of the immediate and direct damage which flow from the injury."

This instruction was directed to Mobil's assertion at trial that the medical treatment administered to Wood was improper and may have served to aggravate Wood's injury. In support of its contention Mobil makes the argument that the instruction could have misled the jury into holding Mobil "strictly liable" even if it found that Dr. Auner mis-diagnosed Wood's condition as carbon monoxide intoxication. No more need be said than to note that this line of analysis follows neither the language or the logic of the instruction. Mobil also argues that the instruction was a misstatement of the law. However, in *Gertz v. Campbell*, 55 Ill. 2d 84, 302 N.E.2d 40, the court stated:

"In this State, and generally, a person injured through another's negligence can recover from the original tortfeasor not only for the original injury but for any aggravation of the injury caused by a physician's malpractice, assuming that there was no want of ordinary care by the injured in the selection of the physician." (55 Ill. 2d 84, 88, 302 N.E.2d 40, 43.)

Thus if under the facts of the instant case the jury were to have found, as urged by Mobil, that Wood's injury was aggravated by the medical treatment given him, the jury was properly instructed that such lack of care is not a bar to recovery for the aggravation of the injury caused thereby.

■■ Mobil also contends that the court erred in refusing Mobil's tendered instruction on Wood's duty to exercise ordinary care in obtaining medical treatment (IPI Civil No. 33.01). We find that the court

properly refused this instruction since there exists no evidence in the record raising as an issue of fact any negligence by Wood in securing medical attention.

We turn next to three issues raised by Mobil in regard to trial error allegedly committed. Mobil first contends that the trial court erred in allowing certain testimony of Robert Oster, a Towmotor engineer. It appears that Mobil's contention was intended to refer to another Towmotor engineer, William Evans. Evans testified concerning a change in Towmotor's operator's manual which added a warning on proper ventilation when using its fork lift trucks. Evans further testified that Towmotor failed to transmit the warning to Mobil.

■■ Mobil contends that the testimony about Towmotor's revised manual violated the best evidence rule and that the revised manual itself should have been introduced into evidence. Since Mobil failed to object at trial to the testimony based on the best evidence rule, we deem Mobil to have waived consideration of this issue. (*Lang v. Parks*, 19 Ill. 2d 223, 166 N.E.2d 10.) In any event, the testimony was related only to plaintiffs' theories against Towmotor and if error were committed, it was not prejudicial to Mobil.

■■■ The next issue involves a video tape produced by Mobil which depicts the operation of a fork lift in loading two trailers and shows a panoramic view of Mobil's Building 11 where the incident took place. Mobil was only permitted by the court to show certain portions of the tape and thus argues that the court erred in limiting the jury's viewing of the whole tape. We, however, find no error in the limits imposed. See *Schofield v. Crandall, Inc.*, 24 Ill. App. 3d 101, 319 N.E.2d 585.

■■ We likewise find no error in regard to the last of these contentions in which Mobil argues that the court erred in allowing the plaintiffs to introduce the rebuttal evidence of psychologist Beck concerning the organic brain damage suffered by Wood. We find the testimony was proper rebuttal.

We are next led to the question of damages and certain of the instructions given thereon. Mobil first objects, citing no authority, to the instruction on the measure of Wood's damages because that instruction included a phrase relating to pain and suffering under IPI Civil No. 30.05. Mobil's analysis is two-fold: first, Mobil argues that there was no evidence of pain and suffering, and second, Mobil argues that all the evidence in this regard concerned Wood's "mental condition" which itself was the "disability resulting from the injury" (see IPI Civil No. 30.04). Mobil points out that this element had already been incorporated in the measure of damages instruction.

■■ We find no merit to this contention. The evidence showed that

the disability inflicted upon Wood was a nonpsychotic, organic brain syndrome in which the brain damage was slight but permanent. The evidence tended to show that the syndrome affected Wood's functioning; extreme nervousness, poor concentration and attention span, inability to accomplish simple mental tasks, poor abstract thinking and difficulty in expression. The evidence also established that Wood suffered from anxiety and depression which was an independent and to some extent, treatable condition and which arose from and was traceable to Wood's inability to function. This "mental condition," as distinguished from Wood's brain damage and its physical manifestations, constitutes mental suffering which has long been held to be subject to compensation and is a proper element of damages to be considered by a jury. *Garvey v. Metropolitan West Side Elevated R. R. Co.*, 155 Ill. App. 601; *North Chicago St. R. R. Co. v. Lehman*, 82 Ill. App. 238.

■■ As to Mobil's further contention that there was no evidence from which the jury could measure Wood's future lost wages, we find that there was evidence of the base wage rate for drivers who were members of plaintiffs' union from which the jury could make a determination of plaintiffs' future loss of wages and pension benefits.

Next, Mobil challenges the giving of plaintiffs' Instruction No. 31 (IPI Civil Nos. 32.01, 32.03, 32.04) concerning the measure of Ercelia Wood's damages for her loss of consortium. Particularly Mobil urges that it was error to have included IPI Civil No. 32.03 which designates the loss of her husband's "services" as an element of damage. In so arguing Mobil presents the rational that IPI Civil No. 32.03 permitted the plaintiffs to be awarded a double recovery of Wood's wage loss and that, in any event, the law only allows a husband to recover the loss of his wife's services but not the converse.

■■ Considering these points together, it has been held by our supreme court that in Illinois, where a husband suffers bodily injury his wife may recover by a separate cause of action for her loss of consortium which may include loss of support, material services, companionship, felicity and sexual intercourse. (*Dini v. Naiditch*, 20 Ill. 2d 406, 170 N.E.2d 881.) Mobil relies, in its contention, upon the failure of IPI Civil No. 32.03 to provide alternative nouns and pronouns by which the phrase may be adapted to a wife's cause of action for the loss of her husband's services. However, in this regard, the antiquated legal dichotomy between the sexes was put to a well deserved extinction by the court in *Dini* which stated, quoting from Justice Cardozo, that:

> " 'Social, political and legal reforms have changed the relations between the sexes and put woman and man upon a plane of equality. Decisions founded upon the assumption of a by-gone

inequality are unrelated to present-day realities, and ought not to be permitted to prescribe a rule of life.' " (20 Ill. 2d 406, 429-30, 170 N.E.2d 881, 892.) Neither spouse may today be viewed as the chattel of the other, rather each spouse commands a right to service by the other by way of marital duty and mutual affection. The services rendered by one spouse to the other broadly includes the general usefulness, industry and attention in the home and within the family.

■■ Ercelia Wood testified that since her husband's injury he no longer shared in the family decision-making, in the rearing and discipline of their three children, nor in the household repairs and chores as he had before the injury. Such evidence supported the giving of IPI Civil No. 32.03.

Nor do we find any merit to Mobil's assertion that the word "services" may have been understood by the jury as including loss of support thus permitting a double recovery. To the contrary, the separate causes of action of husband and wife were jointly tried thus minimizing the possibility of a double recovery, and Ercelia Wood's claim for loss of consortium was argued and could only have been understood as excluding the element of loss of support.

Lastly, Mobil contends that the verdict is excessive and it alleges four factors which it argues gave rise to the passion or prejudice of the jury causing the verdict.

■ The first of the alleged factors was the plaintiffs' reference to Nurse Riggs during closing argument. The record shows that the comment was a brief and isolated one and it was solely directed to the inference that Riggs' description of Wood would have been similar to that given by Auner. We find that the comment could have had very little impact on the jury, if any. Secondly, Mobil argues that a series of newspaper articles influenced the jury. The articles concerned a wholly unrelated brain injury case then being tried in St. Louis, in which, apparently, the plaintiff was claiming $5 million in damages. Mobil, while admitting that the other case involved different facts, contends that the $5 million in damages sought in that case may have served as a "background" influence on the jury in the instant case. We find no merit to this contention. We will not presume impropriety by the jury. Indeed, the record does not even show whether the jury was in fact exposed to the newspaper articles. In any event, trials cannot take place in a vacuum. Justice must rely on the common sense and common experience of jurors and the law will not find as prejudicial an influence as remote as that alleged here. Next, Mobil urges that certain facial expressions by a court clerk influenced the jury. These apparently consisted of smiling at some point during the reading of a deposition. The record gives little insight as

to the conduct in question and we will not speculate on the matter. The trial judge found the conduct to be insignificant and probably unnoticed by the jury. Finally, Mobil challenges Wood's absence from the courtroom during most of the trial as depriving the jury of an opportunity to observe Wood's behavior. Although an order had been entered for his presence throughout the trial, we note that the record does not disclose any complaint made during the trial with reference to his absence. We need only say that in fact Wood was called as a witness and he was extensively examined and cross-examined. The jury thus had an ample opportunity to view the character and conduct of Wood.

In *Lau v. West Towns Bus Co.*, 16 Ill. 2d 442, 453, 158 N.E.2d 63, 69, *cert. denied*, 361 U.S. 127, 4 L. Ed. 2d 180, 80 S. Ct. 256, the court stated:

> "Each verdict for a personal injury must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury in making its determination and to the ruling of the trial judge on the post-trial motions."

It has been variously stated that a court on review will scrutinize the record to determine whether the amount of the verdict is so large as to indicate passion and prejudice or as to shock the judicial conscience. *Lau v. West Towns Bus Co.; Carraher v. Bacon*, 43 Ill. App. 3d 16, 356 N.E.2d 650.

■■ In the instant case there was evidence that Wood's brain damage was slight but permanent; that its affect was pervasive and it resulted in functional difficulties. In addition, as a consequence thereof, Wood suffers from severe anxiety and depression. Wood's life expectancy at the time of trial was 27.6 years. While the awards in this case may well be in excess of the amount this court would have allowed in making the original determination, we do not believe that the awards are so excessive as to show passion or prejudice. Mobil failed to demonstrate that there was any passion or prejudice involved in determining the damages nor does the record reflect such.

Accordingly, we affirm the judgment of the circuit court of St. Clair County.

Affirmed.

CARTER, P. J., and G. MORAN, J., concur.