JEFFREY MONTAG, Plaintiff-Appellant, *v.* THE BOARD OF EDUCA-
TION, SCHOOL DISTRICT NO. 40, ROCK ISLAND COUNTY, *et al.*,
Defendants-Appellees.

Third District No. 82—146

Opinion filed March 4, 1983.

Robert J. Noe, of Bozeman, Neighbour, Patton & Noe, of Moline, and James M. Hood, of Peart & Hood, of Davenport, Iowa, for appellant.

Martin H. Katz and Robert T. Park, both of Katz, McAndrews, Durkee, Balch & Lefstein, of Rock Island, for appellees.

JUSTICE HEIPLE delivered the opinion of the court:

On February 17, 1976, Jeffrey Montag, a 16-year-old junior student at Moline High School, sustained spinal injuries during a gymnastics team practice session which resulted in paralysis. The team was coached by Brent Simmons, an employee of the Rock Island County Board of Education School District No. 40 (the Board). Montag brought suit in three counts against Simmons and the Board.

The first count, against both defendants, alleged they negligently failed to exercise proper supervision over Montag and negligently failed to ensure the proper use of the safety equipment in the gym. The second count, also against both defendants, alleged the defendants' conduct was wilful and wanton. The third count, only against the Board, alleged the Board negligently failed to supply the gym with adequate safety equipment.

The trial court granted defendants' motion to dismiss count one. The court reasoned that the language of section 24—24 of the School Code and the trend of supreme court decisions, following *Kobylanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165, interpreting the section, preclude any action for personal injury against a school district or employee thereof on a negligence theory. Section 24—24 pro-

vides in relevant part as follows:

> "Teachers and other certified educational employees shall maintain discipline in the schools, including school grounds which are owned or leased by the board and used for school purposes and activities. In all matters relating to the discipline in and conduct of the schools and the school children, they stand in the relation of parents and guardians to the pupils. This relationship shall extend to all activities connected with the school program and may be exercised at any time for the safety and supervision of the pupils in the absence of their parents or guardians." Ill. Rev. Stat. 1977, ch. 122, par. 24—24.

After a trial on counts two and three, the jury returned a verdict in favor of both defendants on both counts. Montag, then, submitted a post-trial motion for a judgment notwithstanding the verdict, or in the alternative a new trial, which was denied by the trial court.

On appeal, Montag presents three issues from his post-trial motion: (1) the trial court erred in disallowing the action for negligent supervision; (2) the jury's verdict, insofar as it did not find that the Board negligently failed to supply the gym with adequate safety equipment, was against the manifest weight of the evidence; (3) the trial court committed reversible error by permitting the defendants to introduce a movie depicting the gymnastics routine in question under conditions dissimilar to those in issue.

We affirm the rulings of the trial court and the verdict of the jury.

Before discussing the issues before this court, a brief review of the incident is in order. On the day of the injury, Montag was practicing for competition in the still rings event. The wooden rings were connected to a steel frame by nylon cords and were positioned seven to eight feet above the ground. Two one-inch thick rubber mats and one four-inch thick landing mat were underneath the rings while Montag was performing. Montag had started with the team approximately three months prior to the date of the injury. Nevertheless, he could not be considered an inexperienced beginner. Montag had prior experience with the rings as a gym class student of Simmons' and later, as a team member, exhibited skills which permitted Montag to compete in all but one interscholastic competition.

In competition, a gymnast performs a routine which is composed of a series of individual gymnastics moves. A routine commences when a performer grabs hold of the rings and is completed when the participant performs a dismount. Montag used a dismount called the back uprise dismount in his routine at the time of the injury. This dismount, in part, consists of an airborne backward somersault to a

standing position on the ground. The dismount takes place within two seconds. It is considered to be a move of, at most, intermediate difficulty. Montag testified that he had mastered this dismount two weeks before the injury. While Montag was performing, Coach Simmons was nearby acting as a spotter. A spotter is someone who stands close by in order to assist the performer with physical support or with instructions should the performer encounter difficulty during the routine. Tragically, Montag's dismount went awry. Simmons was unable to reach Montag. And, Montag landed on his back, immediately suffering paralysis.

■ In support of his first issue, Montag proffers several subarguments. Montag suggests that *Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11, in abolishing the tort immunity of school districts, established a right to an action in negligence. Further, the trial court's denial of this right was predicated upon an erroneous interpretation of section 24—24 by the supreme court. In *Kobylanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165, the supreme court recognized a *loco parentis* relationship and concomitant defense for teachers and other certified educational employees, under section 24—24, for activities beyond simply disciplining students. Montag misunderstands *Molitor* and interprets the School Code section too narrowly. *Molitor* only laid to rest the remnants of an antiquated common-law construct of sovereign immunity. *Molitor* did not suggest that it is unconstitutional for the legislature to enact a statutory governmental immunity. The issue at hand is not the validity of statutory governmental immunity, but its scope.

In reading the statute, Montag relies upon the reasoning of the dissenting opinion in *Kobylanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165, 175, and argues that section 24—24 does not apply to nondisciplinary circumstances, such as gymnastics team practice. According to this reasoning, Simmons' coaching would fall outside the scope of the section's immunity and Montag could thus proceed on a negligence theory. This is a clever argument. But, it is also an argument which has been rejected by the majority of the supreme court on several occasions. (*Kobylanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165; *O'brien v. Township High School District 214* (1980), 83 Ill. 2d 462; *Thomas v. Chicago Board of Education* (1979), 77 Ill. 2d 165.) We are compelled to follow the interpretation of the high court and rule that the language of the statute extends the *loco parentis* relationship to circumstances other than just disciplinary conduct.

■ In *Kobylanski*, the plaintiffs were injured during physical edu-

cation class while using gymnastic equipment. The defendants raised the *loco parentis* relationship immunity of the School Code as a defense. The court reasoned that the statute indicates "this relationship applies to all activities in the school program. Since physical education is a required part of the academic curriculum (Ill. Rev. Stat. 1967, ch. 122, pars. 27—5 to 27—7), the classes in which [the plaintiffs] were injured are clearly 'activities connected with the school program.'" (63 Ill. 2d 165, 172.) An argument could be made that gymnastics team practice is an extracurricular event which is *not required* by the school program and thus not *connected with* the program. *Thomas* indicates that such a reading would be unduly narrow. (77 Ill. 2d 165, 172.) First, there is not a reference in the statute to activities *required by* the program, only activities *connected with* the program. Second, extracurricular activities, such as gymnastics, are within the legislative mandate that "School Boards *** shall provide for *** the physical education *** of pupils" (Ill. Rev. Stat. 1977, ch. 122, par. 27—5), and therefore are *connected with* the school program. Consequently, it is the opinion of this court that the coaching of a gymnastics team practice session is within the *loco parentis* immunity provided by section 24—24.

Next, Montag seems to raise three constitutional arguments. First, it is claimed that the statute is irrational because it allows an immunity from negligence for teachers but not for other noncertified school personnel who may engage in the same activity. There must be a rational basis for any statute in order to render it constitutional. The rationality of the section's scope was explained in *Kobylanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165, 175, and need not be repeated here. Furthermore, other noncertified school employees are granted an immunity by the Local Governmental and Governmental Tort Immunity Act (Ill. Rev. Stat. 1977, ch. 85, par. 3—108). See *Edmonson v. Chicago Board of Education* (1978), 62 Ill. App. 3d 211.

Second, plaintiff questions the application of the statute and suggests there is not a rational basis for distinguishing between the type of equipment supplied and the type of supervision provided. In the former case, courts have allowed an action in negligence against school districts. In the latter, teachers have been held immune to suits in negligence. The rationale is clear. The section only applies to teachers acting within the student-teacher relationship. The actions of a school board in purchasing and supplying the equipment does not come within this special relationship. The instructor need only make a reasonable inspection of the equipment. In *Thomas*, the court explained "[a] coach's duty to inspect the equipment is subsumed within

his or her duty to supervise but does not fall under the school district's authority to furnish. In practice we believe it would be difficult to beneficially and intelligently distinguish inspecting equipment from supervising students and their use of it." (77 Ill. 2d 165, 171.) Where a student is injured, the possible liability of the teacher and the possible application of the statutory immunity is based upon causation. The student-teacher relationship must give rise to the conduct which was the proximate cause of the plaintiff's injuries. (*Griffis v. Board of Education District 122, Oak Lawn* (1979), 72 Ill. App. 3d 784, 789) in order for the immunity to apply. Where something or someone outside this relationship is the proximate cause of the injury, then an action in negligence may lie.

Third, Montag, again following the dissent in *Kobylanski*, states that classifications designed to confer immunity on a local government entity must be based upon the type of activity or function involved, not on the nature of the governmental entity. Montag does not explain how this rule applies to section 24—24. By its term, the statute does not grant immunity to school districts. Moreover, the immunity conferred upon teachers is directly related to their activity and function—that is, the immunity fosters the development of a secure student-teacher relationship uninhibited by the possibility of a suit in negligence against the instructor. *Thomas v. Chicago Board of Education* (1979), 77 Ill. 2d 165, 171.

Lastly, Montag offers two arguments to support the proposition that the wilful and wanton standard is inapplicable. First, it is argued the statute does not require wilful and wanton conduct and the supreme court has never directly held that negligence cannot be a standard in an action between parties in *loco parentis*. We disagree. The high court in *Kobylanski* reasoned "it logically follows that teachers, standing in *loco parentis*, should not be subjected to any greater liability than parents ***." (63 Ill. 2d 165, 172-73.) The court then concluded section 24—24 "confer[s] upon teachers and other certificated educational employees immunity from suits for negligence ***. In order to impose liability against such educators, a plaintiff must prove wilful and wanton misconduct." 63 Ill. 2d 165, 173.

▪ Secondly, Montag proffers the interesting supposition that under the rule announced in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, the doctrine of wilful and wanton misconduct has been abolished in favor of the weighing of the relative fault of the parties. Again, we must disagree. The adoption of comparative negligence principles in other States has not led to an elimination of the wilful and wanton standard of conduct. The issue raised concerning the wanton, or reckless,

standard, by the introduction of comparative negligence, has questioned the status of the contributory negligence defense, but not the standard of liability itself. Some courts have continued the pre-comparative-negligence principle that a reckless defendant cannot raise the issue of the plaintiff's contributory negligence. Others have allowed the defendant to establish contributory negligence on the part of the plaintiff in order to weigh the relative fault of the parties. (*Cf. Amoco Pipeline Co. v. Montgomery* (W.D. Okla. 1980), 487 F. Supp. 1268; *Danculovich v. Brown* (Wyo. 1979), 593 P.2d 187; *Nga Li v. Yellow Cab Co.* (1975), 13 Cal. 3d 804, 825-26, 532 P.2d 1226, 1241, 119 Cal. Rptr. 858, 873; *Bielski v. Schulze* (1962), 16 Wis. 2d 1, 16, 114 N.W.2d 105, 113; B. Schwartz, Comparative Negligence sec. 5.3, at 104 *et seq.* (1974); Kionka, Comparative Negligence Comes to Illinois, 70 Ill. B.J. 16 (1981).) Had our supreme court wished to eliminate posthaste the wilful and wanton standard it would have so indicated in *Alvis*. It did not do so and we shall not do so here. Therefore, it is the opinion of this court that the trial court did not err in disallowing Montag's action based upon negligent supervision.

We next turn to Montag's second issue, which is whether the jury's verdict, that the school board did not negligently fail to provide adequate safety equipment, was against the manifest weight of the evidence. Plaintiff's attorneys support this contention with several references to the record. Their expert, in unrefuted testimony, stated that the gym as a whole was unsafe because there were not enough mats to adequately supply every piece of equipment in the gym. Also, it is undisputed that a safety belt was not available for use with the rings prior to and at the time of the injury. Plaintiff's attorneys concede that a safety belt would not have been normally used at the time of the routine and dismount in question; but, they add, prior availability of a safety belt would have allowed Montag to better learn the dismount, possibly saving him from injury. They note also that the only 12-inch mat in the gym was not under the rings because it interfered with the performance of taller teammates. Plaintiff's attorneys suggest that a higher mat may have changed the angle at which Jeffrey struck the ground, also perhaps saving him from injury. And, lastly, they direct the court's attention to the testimony of one of the defendants' experts, a consulting engineer in biomechanics. He agreed, on cross-examination, that any combination of four-inch and 12-inch mats could not have prevented a neck injury in the situation in question. At the time of the injury, there were two one-inch mats and one four-inch mat under the rings. Coach Simmons testified that in competition only six inches of matting is normally allowed under

the rings, and that he was trying to simulate competition conditions. The team was preparing for district competition which was three days away.

The issue at hand is one of causation. Plaintiff's attorneys extend the causational chain too far into the abstract. We can only speculate what prior use of a safety belt could have done for Jeffrey. Further, it should not be asked whether the gym as a whole was unsafe, but whether there was adequate matting in use under the rings at the time of Jeffrey Montag's injury. Granted a slight turning may have protected Jeffrey and it would seem more matting would have been better; however, plaintiff's witnesses did not show that more matting would have prevented the injury. Defendants' expert in biomechanics, in unrefuted testimony, explained, on direct examination, that only three feet of nonresilient padding could have prevented Jeffrey's injury, and as of yet no one has invented such a matting.

■ The only question is whether the jury's verdict was against the manifest weight of the evidence. There is not undeniable evidence that the matting used was in any way defective, or improperly used, or that a 12-inch mat, instead of a four-inch mat, could have prevented the injury. There is evidence that Coach Simmons was using the type and thickness of matting normally used for the upcoming competition and that the only type of matting which would have prevented the injury did not, and does not exist.

> "Mindful of all of the evidence in this case, we will not substitute our judgment for that of the jury which heard the testimony and observed the witnesses; 'the verdict is not palpably erroneous or wholly unwarranted from the manifest weight of the evidence.' " *Lynch v. Board of Education* (1980), 82 Ill. 2d 415, 428, citing *Sloma v. Pfluger* (1970), 125 Ill. App. 2d 347, 359.

The jury's verdict will stand.

■ The last issue before the court on this appeal concerns the admissibility of a film. Defendants showed to the jury a film of college gymnasts performing the moves and routines which Montag performed in physical education class, early in his team season, and at the time of the injury. Montag argues the film was unnecessarily duplicative of evidence already part of the record and preconditioned the minds of the jurors. The admissibility of demonstrative evidence is a matter within the trial court's discretion, and a court's ruling in this area will not be reversed in the absence of a clear showing of abuse. (*Becker v. Aquaslide 'n' Dive Corp.* (1975), 35 Ill. App. 3d 479, 341 N.E.2d 369.) The Illinois Supreme Court has written:

"[T]he fact that photographic evidence portrays something under conditions not precisely the same as those at the time of the occurrence does not necessarily render it inadmissible, so long as the jury is not misled. [Citations.] Here the jury was admonished not to consider the movie as a re-creation of the conditions of the incident *** but that the film was being shown only to demonstrate to the jury just what this unfamiliar machine, *about which much testimony was given,* looked like and how it performed." (Emphasis added.) *Saldana v. Wirtz Cartage Co.* (1978), 74 Ill. 2d 379, 391.

■■ Likewise, in this case, the film was used to show the jury what the routines looked like and how they were performed. Up until the film's showing, the jurors were only given verbal descriptions and a few drawings which attempted to illustrate the various movements of the body in the routine. This evidence certainly could not offer a totally accurate portrayal of the movements of the body in the whole routine. Thus, while the movie purported to show the movements in the routine, as did the pictures, it also added a visual dimension that still pictures or oral testimony could never duplicate. Furthermore, just prior to the showing, the lower court admonished the jury that "the film will be shown for the limited purpose of demonstrating the routine in question." We believe a jury is sophisticated enough to be able to understand and follow this instruction and not be misled into believing the film was an actual re-creation of the occurrence. The trial court did not abuse its discretion in this matter.

Based upon the foregoing reasons, the verdict of the jury and the rulings of the trial court are affirmed.

Affirmed.

BARRY, P.J., and STOUDER, J., concur.