GLORIA GLASSMAN, Indiv. and as Special Adm'r of the Estate of Sheldon Glassman, Deceased, Plaintiff-Appellant and Cross-Appellee, v. ST. JOSEPH HOSPITAL, Defendant-Appellee and Cross-Appellant (David O. Monson *et al.*, Defendants-Appellees).

First District (2nd Division)   No. 1—90—1456

Opinion filed March 1, 1994.—Rehearing denied April 21, 1994.

Philip J. Nathanson & Associates, of Chicago (Philip J. Nathanson, of counsel), for appellant.

Pretzel & Stouffer, Chartered, of Chicago (David J. Loughnane, Alan J. Schumacher, Robert Marc Chemers, and Scott O. Reed, of counsel), for appellees David O. Monson and Milton Weinberg, Jr.

Cassiday, Schade & Gloor, of Chicago (Rudolf G. Schade, Timothy J. Ashe, and Michael M. Tannen, of counsel), for appellee St. Joseph Hospital.

JUSTICE McCORMICK delivered the opinion of the court:

Plaintiff, Gloria Glassman, individually and as special administrator of the estate of Sheldon Glassman, deceased, sued St. Joseph Hospital (the hospital), Dr. David Monson and Dr. Milton Weinberg, Jr. (the surgeons), for medical malpractice related to heart surgery which led to Sheldon Glassman's brain damage. The trial court entered judgment on the jury's verdicts in favor of the surgeons and

against the hospital, assessing total damages of $51,764. Plaintiff appeals from both judgments, and the hospital cross-appeals from the judgment against it.

We find sufficient evidence to support the verdicts, and we find that the trial court committed no reversible error in its many rulings both prior to and in the course of the trial. Therefore, we affirm the judgments.

Sheldon Glassman had chest pains in the fall of 1979, so he went to see Dr. Herman Eisenberg. Dr. Eisenberg had been Sheldon's personal physician for years, and he was also the uncle of Sheldon's wife, Gloria Glassman. Sheldon was a certified public accountant who owned an accounting firm. Dr. Eisenberg subjected Sheldon to a stress test, which indicated heart irregularities. Dr. Eisenberg admitted Sheldon to the hospital for an angiogram. The cardiologists who performed the angiogram on November 1, 1979, found the arteries blocked as a result of arteriosclerosis. The cardiologists recommended bypass surgery to repair the diseased arteries as soon as possible. The surgeons looked at Sheldon's medical record and agreed that he needed coronary artery bypass surgery.

The surgeons performed the operation on November 6, 1979. The anesthesiologist used enflurane as the anesthetic. After opening Sheldon's chest, Dr. Monson inserted a tube into the aorta from a heart-lung machine, and then he inserted a tube into the vena cava to drain the blood into the heart-lung machine. The machine performed the work of the heart and lungs, oxygenating the blood and pumping it into the aorta to circulate through the body. The machine contained two liters of a saline solution which the machine gradually added to the bloodstream. The surgeons ordered assistants to add to the saline solution an anticoagulant and 12 grams of oxacillin, a penicillin derivative, as a prophylactic antibiotic.

The surgeons cooled the body to 85 degrees and stopped the heart for the operation. Monson opened a coronary artery and removed the plaque from it, then attached one end of a healthy vein which Dr. Weinberg removed from Sheldon's leg to the artery. Monson attached the other end of the vein to the aorta. The operation, which took more than four hours, went well.

The surgeons accompanied Sheldon to the intensive care unit (ICU), but they left to perform another surgery shortly thereafter. Monson then went to Rush-Presbyterian-St. Luke's Medical Center (Rush) to perform two more surgeries, leaving Sheldon in Weinberg's care. The surgeons, by written order, instructed nurses to take vital signs, including temperature, pulse and respiration, every 15 minutes while Sheldon was in the ICU.

Nurse Eugene Shaw took care of Sheldon in the ICU on November 6, 1979, immediately following surgery. At 11 a.m. he charted Sheldon's temperature as 99.8 degrees. At 11:30 a.m. he observed total body shivering, which is a normal response for a patient coming out of heart surgery, while his body is warming to a normal temperature. At noon Sheldon's temperature was 100.6, and by 1 p.m. it was 102 degrees. Weinberg ordered administration of Tylenol to control the fever. When Shaw next took Sheldon's temperature at 2 p.m., the fever had risen to 105.3 degrees. Weinberg ordered more Tylenol and a hypothermia mattress.

Despite these measures, at 3 p.m. Sheldon's temperature was still 105.3 degrees. Nurse Beth Kingston relieved Shaw at 3:30 p.m., and she noted that Sheldon showed extra-ocular movements. Kingston noted further shivering around 4 p.m. At 4:15 Weinberg ordered a small dose of Thorazine, also as a measure to reduce fever. At 4:25 Weinberg ordered Kingston to administer 100 milligrams of Dilantin, an anticonvulsant. Sheldon's temperature rose to 106 degrees, and Kingston began taking Sheldon's temperature every half hour as his temperature fell slowly to 102.6 degrees by 8 p.m. At 5:15 Sheldon opened his eyes and Kingston observed more extra-ocular movement. Weinberg ordered another 100 milligrams of Dilantin.

Although most heart surgery patients wake up within a few hours following surgery, Sheldon remained unconscious. Between 6 and 7:30 p.m. he experienced a seizure, and Weinberg requested consultation with Dr. Marsha Horwitz, a neurologist, who arrived at 7:30. Sheldon then experienced a grand mal seizure. Horwitz ordered 800 additional milligrams of Dilantin immediately, to be followed with 200 more milligrams of Dilantin 45 minutes later.

Despite the anticonvulsant medication, Sheldon experienced another seizure at 8:45, and Kingston administered another 200 milligrams of Dilantin. After Horwitz left, Sheldon experienced grand mal seizures at 9:15 and 9:45 p.m. Kingston notified Horwitz after 9:45, and Horwitz called back to order, according to the hospital record,

"If pt has another seizure in next 1/2 [hour] give 200 mg phenobarb IM—then if he seizures within the next 4 [hours] please repeat with 200 mg IM phenobarb."

Sheldon had another generalized seizure at 10:05 p.m. Kingston administered the phenobarbital intramuscularly, as ordered. At 10:40 Sheldon had another seizure, followed by another at 11:10. Kingston did not further medicate Sheldon or notify any physician about the seizures.

Nurse Joan Luchetti relieved Kingston at 11:30 p.m. She observed

Sheldon's generalized seizures at midnight and at 12:20 a.m. on November 7, but she did not administer medications or notify the physicians. Luchetti contacted Weinberg around 1 a.m. when Sheldon's central venous pressure rose. She called him again at 1:45 following a violent seizure, in which Sheldon began thrashing. She administered 200 milligrams of phenobarbital at 2 a.m.

Sheldon next had a generalized seizure at 4:15 a.m. Luchetti neither administered medicine nor contacted Sheldon's doctors. At 7 a.m. Sheldon had another seizure, but he received no medication. Before 8 a.m. Sheldon had another seizure, and an hour later he received maintenance doses of 100 milligrams of Dilantin and 200 milligrams of phenobarbital. Sheldon continued to experience seizures, without regaining consciousness, throughout the day on November 7, 1979.

When Sheldon regained consciousness on November 9, 1979, he did not know where or who he was. He had suffered severe permanent diffuse brain damage. He never again worked as an accountant, nor could he hold any steady employment.

On September 2, 1981, Sheldon and Gloria sued the hospital, the surgeons, the cardiologists, the anesthesiologist and the manufacturer of the heart-lung machine. After extensive discovery on theories of equipment malfunction and negligence of the anesthesiologist and the cardiologists, Sheldon and Gloria voluntarily dismissed the suit against the manufacturer and the cardiologists. The trial court granted the anesthesiologist's motion for summary judgment. Sheldon died in July 1988, more than a year prior to trial, of causes unrelated to this suit. The trial court appointed Gloria special administrator of Sheldon's estate for purposes of bringing this suit. Thus, Gloria was the sole plaintiff at trial, acting both on her own behalf and as administrator of the estate, and the only defendants at trial were the hospital and the surgeons.

In the complaint that formed the basis for the trial, plaintiff alleged that the surgeons (1) ordered an excessive dose of oxacillin; (2) failed to take proper measures to control Sheldon's fever after the operation; (3) misdiagnosed and therefore improperly treated Sheldon's condition; (4) administered inadequate anticonvulsants prior to 7:30 p.m. on November 6, 1979; (5) on the advice of Dr. Horwitz ordered inadequate anticonvulsants after 7:30 p.m.; (6) failed to properly monitor care after Horwitz became involved in the case; and (7) failed to properly supervise subsequent care for Sheldon. Plaintiff alleged that the hospital was responsible for the nurses who (1) failed to follow the surgeon's orders; (2) misinterpreted Horwitz's 10 p.m. order for phenobarbital, and therefore administered the dosages later than ordered; and (3) failed to notify the surgeons about the seizures.

Following a lengthy trial the jury returned a verdict in favor of both surgeons, and it found for plaintiff against the hospital, assessing damages for Gloria, individually, of $1,764 for medical expenses, and nothing for loss of services or companionship. The jury also assessed damages in favor of Sheldon's estate in the amount of $50,000 for pain and suffering resulting from the injury caused by the hospital's negligence, but assessed no damages for disability or lost earnings.

Plaintiff appeals from the judgments, and the hospital cross-appeals from the judgment against it. The hospital points out that much of plaintiff's appeal will be moot if we find in favor of the hospital on the cross-appeal. Therefore, we first address the cross-appeal, in which the hospital argues that the court should have granted its motion for judgment notwithstanding the verdict.

## I

Plaintiff's expert, Dr. Gastone Celesia, testified that nurses at the hospital violated the standard of care between 6 and 7:30 p.m. on November 6, 1979, when Sheldon had a seizure and the nurses failed to notify doctors of the seizure. The seizures should have been stopped right away with anticonvulsant medication, "[b]ecause if the seizure[s] do persist, they become more difficult to control," and because seizures alone "may produce brain damage, permanent."

Plaintiff showed Celesia the 10 p.m. order for 200 milligrams of phenobarbital, with an additional 200 milligrams if the patient seizes within the following four hours. Plaintiff asked "whether the [p]henobarbital regimen set forth on that order is adequate for Sheldon Glassman in view of his condition at 10:00 p.m." Celesia answered that to a reasonable degree of medical certainty, the order for 200 milligrams of phenobarbital given intramuscularly with a followup dose sometime later was an inadequate dose given in the wrong manner. The medicine should have been administered intravenously, so it could work faster, and the doctor should have ordered a loading dose of 1,500 milligrams. A loading dose is the amount of a drug needed to achieve the blood level which should have therapeutic effect.

The hospital objected to this testimony on grounds that under Supreme Court Rule 220 (134 Ill. 2d R. 220), Celesia could not give an opinion on whether the nursing staff properly interpreted Horwitz's order. Plaintiff responded that she was "not asking the interpretation of the order." The hospital in its brief purports to quote from the transcript a lengthy discussion following this remark. The discussion is not on the pages cited in the brief. We have been unable to find in the record most of the further remarks the hospital attributes to plaintiff's counsel. The trial court overruled the objection.

Dr. Celesia testified that in his opinion the order for 200 milligrams of phenobarbital administered intramuscularly at 2 a.m. was insufficient to meet the standard of care. Nurses should have notified the doctors following Sheldon's seizures at 10:40 p.m., 11:10 p.m., midnight, 12:20 a.m. and 4:15 a.m. The nurses' failure to notify the doctors of the seizures Sheldon suffered overnight on November 6 and 7, 1979, contributed to the brain damage.

The hospital's attorney asked Celesia whether "the failure to notify a physician at 8:45 and at 9:15 caused this patient injury." Celesia answered: "Yes. He kept fitting, yes."

The hospital's attorney then asked:

"[I]f Dr. Weinberg were to testify that it is his opinion he was kept fully apprised of this patient's condition at all times on the 6th and the morning hours of the 7th, would that change your opinion as to whether the nurses in that time frame violated the standard of care for nurses by failing to keep the physician advised of the patient's condition?"

Celesia answered: "In the hypothetical case he was fully appr[i]sed, then it would be okay." On redirect he clarified that if the nurses failed to notify the doctors following seizures at 10:40 and 11:10 p.m. on November 6, then the nurses "did not properly notify the doctor in that hypothetical situation." And if the nurse failed to notify the doctors of further seizures occurring between midnight and 7 a.m. on November 7, then the doctor was not fully apprised of the situation.

Dr. David Treiman explained that status epilepticus is a condition in which a patient has a series of seizures. It is formally defined as "two or more seizures without full and complete consciousness between seizures." The seizures themselves may cause brain damage.

In Treiman's opinion, Dr. Weinberg should have considered status epilepticus as a possible diagnosis by 5:15 p.m. on November 6, 1979. This condition was a medical emergency which should have been treated with "large doses [of] anticonvulsant drugs given intravenously until the clinical seizure activity stops and the patient starts awakening." The 100-milligram dose of Dilantin Sheldon received at 4:25 p.m. on November 6 was inadequate, and it was a.deviation from the standard of care. Weinberg should have given a loading dose of 1,600 milligrams of Dilantin. The failure to administer a full loading dose harmed Sheldon by allowing his seizures to continue for more than a day.

Dr. Treiman testified that Sheldon was certainly in status epilepticus by 7:30 p.m. on November 6. Although Treiman agreed that the diagnosis of status epilepticus may be ambiguous in some situations, he never found any ambiguity in application of the definition of status

epilepticus to Sheldon's condition at 7:30 p.m. Weinberg deviated from the standard of care when he neither diagnosed status epilepticus nor obtained assistance of a doctor who could come to that diagnosis. Dr. Horwitz deviated from the standard of care by failing to diagnose status epilepticus. Each deviation from the standard of care harmed Sheldon by permitting the seizures to continue: the longer seizures continue, the more difficult they are to stop.

After 9:15 p.m. on November 6, when the 1,400 milligrams of Dilantin Sheldon had received failed to stop the seizures, in Dr. Treiman's opinion the standard of care required doctors to take further steps to control the seizures. The doctors could give more Dilantin, or they could give a loading dose of another drug, such as phenobarbital. For Sheldon a loading dose of phenobarbital would have been about 1,800 milligrams. The phenobarbital administered to Sheldon on November 6 and 7, 1979, was insufficient to meet the standard of care. The deviations from the standard of care on both November 6 and 7 contributed to the brain damage Sheldon suffered.

Nurse Kingston testified that when Dr. Horwitz ordered 200 milligrams of phenobarbital by phone, Kingston understood the order to mean she should administer 200 milligrams if the patient seized within a half hour, and if there were additional seizures over the next four hours she should give the patient another 200 milligrams at the end of the four-hour period. Nurse Luchetti testified that she interpreted Horwitz's order the same way. She did not call Dr. Weinberg after each seizure because she saw that an anticonvulsant had already been ordered.

Dr. Horwitz testified on direct examination that the nurses correctly gave Sheldon phenobarbital at 10:15 p.m. on November 6 and 2 a.m. on November 7, in full compliance with her order. On cross-examination, however, she said that the nurses failed to comply with the order by failing to administer the second phenobarbital dose immediately after the seizure at 10:45 p.m., 30 minutes after Sheldon received the first dose of phenobarbital.

Counsel for the hospital asked Dr. Weinberg whether, when he came to the hospital on November 7 and reviewed the chart, he felt that the information he received from the nurses overnight was "generally consistent with what you found recorded in the chart as to what had gone on with that patient." He answered, "Yes, I think. I don't remember." Counsel never asked, and Weinberg never said, that the nurses kept him fully apprised of Sheldon's condition.

The hospital contends that the evidence properly before the jury cannot support the jury's verdict for plaintiff. Plaintiff argued at trial that Dr. Horwitz's testimony established that the nurses misinter-

preted her 10 p.m. order and therefore they delayed administration of an anticonvulsant, and the testimony of Dr. Treiman and Dr. Celesia established that the delay in administration caused some additional harm to Sheldon. The hospital claims that the trial court should have held that plaintiff was estopped from making this argument insofar as it relies on Celesia's testimony, and that this use of Celesia's testimony violates Rule 220. The hospital advances this issue solely as grounds for judgment notwithstanding the verdict; the hospital expressly asks this court not to grant a new trial, even if admission of Celesia's testimony was error.

■ The court should grant judgment notwithstanding the verdict only if all the evidence, viewed in the light most favorable to the verdict, so overwhelmingly favors the party seeking judgment that no contrary verdict could ever stand. (*Hoem v. Zia* (1992), 239 Ill. App. 3d 601, 627, 606 N.E.2d 818.) The jury here could have found the hospital liable for the misinterpretation of the order even without Celesia's testimony, from the testimonies of Dr. Horwitz and Dr. Treiman. Horwitz said that the nurses delayed administration of the phenobarbital she ordered by three hours. Treiman testified that delay in administering anticonvulsants can harm a patient, because any delay in stopping seizures makes the seizures harder to stop thereafter.

Moreover, Celesia's testimony did not violate Rule 220, and the trial court properly refused to hold plaintiff estopped from relying on Celesia's testimony for this issue. Plaintiff's attorney said only that he would not use Celesia's testimony to establish that the nurses misinterpreted Horwitz's order, which is to say that his testimony would not go to the standard of care on this issue. Plaintiff never attempted to use Celesia's testimony to establish the standard of care on this issue, nor could she have so used Celesia's testimony, since Celesia never gave any opinion concerning the proper interpretation of the order. Plaintiff never said that she would not use Celesia's testimony to show that the misinterpretation caused injury. Hence, there is no basis for estopping plaintiff from making the argument she actually made. Celesia said consistently in both his discovery deposition and his testimony that the delay in the administration of proper anticonvulsant medication causes harm because the longer the seizures go untreated, the more difficult they are to stop, and each seizure can cause brain damage. Thus, Celesia's testimony did not violate Rule 220.

The hospital also argues that the evidence cannot support a finding that the failure to notify the physicians constituted a deviation from the standard of care. Celesia stated in both his

discovery deposition and in his evidence deposition that the nurses deviated from the standard of care by failing to promptly notify doctors of each seizure, and this failure caused injury. The hospital contends that this testimony is a nullity because Celesia also testified that, in the hypothetical case, as the nurses kept the doctors fully apprised of Sheldon's condition, their conduct in that respect did not violate the standard of care. The hospital claims that the undisputed evidence proves that the nurses kept the doctors so apprised.

Nurses Kingston and Lucchetti testified that they observed multiple seizures overnight on November 6 and 7 and they did not contact the doctors following most of those seizures. Celesia testified that if they failed to contact the doctors after any seizure, they failed to keep the doctors fully apprised, so they violated the standard of care. Even Dr. Weinberg did not testify that the nurses kept him fully apprised. The closest Weinberg's testimony came was when the hospital's attorney asked whether, when he came to the hospital on November 7, Weinberg felt that the information he received from the nurses overnight was "generally consistent with what [he] found recorded in the chart." Weinberg answered, "Yes, I think. I don't remember." This equivocal testimony is not an adequate basis for judgment notwithstanding the verdict.

The jury could have found for plaintiff and against the hospital consistently with its decision for the surgeons on all charges, either because nurses failed to notify the doctors overnight of the seizures, or because nurses misinterpreted Dr. Horwitz's 10 p.m. order and therefore delayed medication. The trial court correctly denied the hospital's motion for judgment notwithstanding the verdict.

## II

We turn next to plaintiff's appeal. Plaintiff advances 40 separate trial rulings as grounds for reversal. Plaintiff simply lists many rulings in her brief, with minimal argument and, for many rulings, with no citation to authority.

> "[A] reviewing court is entitled to have the issues on appeal clearly defined, including the citation of pertinent authority and the presentment of cohesive legal argument. [Citations.] Further, a reviewing court is not a depository in which an appellant may dump upon the court the entire matter of pleadings, argument, and research." *Hassan v. Wakefield* (1990), 204 Ill. App. 3d 155, 159, 561 N.E.2d 1160.

We will not address the issues for which plaintiff provides no citation to authority. We group the issues with adequate citations as those pertaining to pretrial rulings and those pertaining to trial

rulings. We then separately address plaintiff's motion for a new trial on damages only.

## A. VIOLATION OF PHYSICIAN-PATIENT PRIVILEGE

Plaintiff moved *in limine* to bar defendants from calling Dr. Eisenberg as a witness because of pretrial communication between the surgeons' attorneys and Dr. Eisenberg, Sheldon's treating physician. On January 8, 1982, the surgeons' attorney met with Eisenberg and an attorney who worked for the firm which represented plaintiff at the time. Soon after the meeting the surgeons' attorney sent Eisenberg, but not plaintiff's attorney, a letter accompanied by an affidavit. In the letter counsel said:

"In the aftermath of our conference of January 8, 1982, I have prepared an affidavit, which I would like you to review and sign. *** I think the affidavit accurately sets out your opinion and I am hopeful that at some point it will short-circuit the need for lengthy depositions and court proceedings."

Eisenberg signed the affidavit, which stated: "[T]o a reasonable degree of certainty, there was no deviation from the accepted standard of medical and surgical practice on the part of Dr. Monson [or] Dr. Weinberg *** in the care rendered *** for Sheldon Glassman." The surgeons' attorney sent plaintiff's attorney a copy of the affidavit in March 1983, about a year after the conference.

The trial court held an evidentiary hearing on the motion *in limine*. Eisenberg remembered only that there may have been some such discussion in his office, and he identified his signature on the affidavit. Plaintiff's principal attorney at the time of the meeting testified that he received advance notice of the meeting with Eisenberg, and he believed that another attorney from his office attended because he could not. The attorney for plaintiff who attended the meeting remembered only that he had met Eisenberg somewhere before, possibly at the meeting on January 8, 1982. The surgeons' attorney testified that the meeting was brief. Although he could not recall specifically much of the conversation, he was sure that the contents of the affidavit did not "go beyond in any way the conference" of January 8.

The trial court found that the meeting was not an *ex parte* discussion with a treating physician because an attorney for plaintiff was present. However, the court found that the letter and accompanying affidavit constituted an improper *ex parte* communication. The court barred use of the affidavit, but it did not bar defendants from calling Eisenberg as a witness.

In *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581,

596, 499 N.E.2d 952, the court held that in order to preserve the sanctity of the physician-patient relationship, *ex parte* discussions between defense attorneys and plaintiffs' treating physicians were prohibited. The court restricted the defendant to formal discovery from plaintiff's physician. Courts applying *Petrillo* have expressly held that its reasoning applies to *ex parte* contacts which occurred before the court announced the *Petrillo* decision (*Karsten v. McCray* (1987), 157 Ill. App. 3d 1, 14-15, 509 N.E.2d 1376), and it prohibits *ex parte* letters from defense counsel to a plaintiff's doctors (*Nastasi v. United Mine Workers of America Union Hospital* (1991), 209 Ill. App. 3d 830, 839, 567 N.E.2d 1358).

In *Almgren v. Rush-Presbyterian-St. Luke's Medical Center* (1992), 240 Ill. App. 3d 585, 594, 608 N.E.2d 92, the court explained that the therapist-patient privilege, like the physician-patient privilege, "establishes plaintiff's right to prevent disclosure from [plaintiff's doctor] to defendant's attorney of information unrelated to the case but potentially damaging to plaintiff. That right cannot be protected if defendant's attorney is permitted private discussions with [plaintiff's doctor]." The court in *Almgren* expressly approved use of alternatives to strict compliance with formal discovery, if the court can find "some other means of protecting plaintiff's right to limit disclosure of potentially damaging matters. Thus, the trial court could permit plaintiff, or her attorney, to be present at all discussions between defense counsel and [plaintiff's doctor]." *Almgren*, 240 Ill. App. 3d at 594.

Eisenberg met with an attorney for the surgeons and plaintiff's attorney in 1982 to discuss informally Eisenberg's views on the case. Under *Almgren*, the presence of plaintiff's attorney was sufficient to protect plaintiff's interests, so the conference did not violate *Petrillo*.

The surgeons' attorney then sent Eisenberg a letter and an accompanying affidavit, without sending copies first to plaintiff's attorney. Under *Nastasi*, this *ex parte* contact violated *Petrillo*. (*Nastasi*, 209 Ill. App. 3d at 839.) The trial court has discretion to determine an appropriate sanction for a *Petrillo* violation. (*Burns v. Michelotti* (1992), 237 Ill. App. 3d 923, 930, 604 N.E.2d 1144.) In *Nastasi* defense counsel, *ex parte*, sent plaintiff's doctor articles supporting defendant's theory of the case. The court found that defendant sought to influence the doctor's testimony improperly with the letters, and therefore the court held that the doctor's tainted testimony should have been excluded. *Nastasi*, 209 Ill. App. 3d at 840.

In *Mahan v. Louisville & Nashville R.R. Co.* (1990), 203 Ill. App. 3d 748, 561 N.E.2d 127, one of plaintiff's treating physicians spoke to

defense counsel *ex parte* for no more than 30 seconds prior to the doctor's deposition. The trial court permitted the doctor to testify and the appellate court affirmed the judgment for defendant, holding that "the communication between defendant's attorney and plaintiff's physician could in no way have jeopardized" the confidentiality of the physician-patient relationship. *Mahan*, 203 Ill. App. 3d at 754.

■ Here the trial court ruled that the affidavit was the product of prohibited *ex parte* contact and, therefore, defendants could not in any way use the affidavit. However, the court found that the *ex parte* contact did not taint the doctor's testimony otherwise, since the letter and the affidavit did not go beyond the matters discussed at the 1982 meeting which did not violate the physician-patient privilege. The letter was not an improper attempt to influence the substance of the doctor's opinions; it was only an improper effort to procure an affidavit. (See *Burns*, 237 Ill. App. 3d at 931-32.) Therefore, the trial court held that Eisenberg could testify for defendants, even concerning matters discussed at the 1982 meeting, as long as defendants did not attempt to use the affidavit. The trial court appropriately exercised its discretion to fashion a sanction which addressed plaintiff's legitimate concern for preservation of the physician-patient privilege. See *Burns*, 237 Ill. App. 3d at 932.

## B. DISCOVERY OF RECORDS OF OTHER PATIENTS

Plaintiff sought discovery of partial medical records, with the patients' names and identifying numbers deleted, for any patient who underwent surgery by the same surgeons and who experienced difficulties similar to Sheldon's. Defendants claimed that such records were protected by the physician-patient privilege. The trial court denied plaintiff's motions to compel discovery and barred plaintiff from referring to the treatment the surgeons provided other patients on November 6, 1979. Plaintiff contends that the ruling was reversible error.

■ In *Ekstrom v. Temple* (1990), 197 Ill. App. 3d 120, 553 N.E.2d 424, the trial court ordered the defendant hospital to produce medical records of some patients not parties to that action, with the names of the patients deleted. The appellate court reversed, finding that the statutory physician-patient privilege prevented production of records of nonparty patients. (*Ekstrom*, 197 Ill. App. 3d at 130; see Ill. Rev. Stat. 1987, ch. 110, par. 8—802.) The court held that deletion of the patients' names "may not sufficiently protect the confidentiality to which the nonparty patients are entitled." (*Ekstrom*, 197 Ill. App. 3d at 130.) This reasoning fully applies here. Even with the deletion of identifying numbers along with names, the patients' confidentiality may be compromised.

Plaintiff asks this court to overrule *Ekstrom* and related precedents and follow cases from other States instead. The cases on which plaintiff relies did not apply the Illinois statutory physician-patient privilege. (See, *e.g., Hyman v. Jewish Chronic Disease Hospital* (1965), 15 N.Y.2d 317, 258 N.Y.S.2d 397, 206 N.E.2d 338.) We believe *Ekstrom* correctly interprets the physician-patient privilege in Illinois. The trial court properly denied plaintiff's motion to compel discovery of the records sought here.

## C. DR. WEINBERG'S ADMISSIONS

At a discovery deposition, plaintiff's attorney asked Dr. Weinberg if he recalled why he ordered 100 milligrams of Dilantin for Sheldon at 4:25 p.m. on November 6, 1979. Weinberg answered:

"I have no recollection, but \*\*\* nurse's notes indicate that the patient had \*\*\* movements of the eyes and twitching of one of the extremities, which was suggestive of seizure activity.

\* \* \*

\*\*\* I thought there was evidence of seizure activity. That's the reason for giving the [D]ilantin.

Q. \*\*\* Dr. Ho[r]witz came in on a consult, according to the chart, about 7:30 that evening. Did you request that consult?

A. Yes.

Q. And briefly, why did you request that?

A. The neurologists have a much broader knowledge of cerebral vascular disease than I do, and I wanted as expert an opinion \*\*\* as I could obtain."

Prior to trial plaintiff gave notice that she intended to read this testimony and several other responses into the record as admissions. Plaintiff sought to use this testimony to establish that as of 4:30 p.m. on November 6, 1979, Weinberg knew that Sheldon was experiencing seizures which he treated inadequately, and plaintiff sought to hold Weinberg liable for Dr. Horwitz's alleged malpractice by proving Weinberg selected Horwitz. Plaintiff moved *in limine* for an order "precluding Dr. Weinberg from contradicting, explaining away or withdrawing" these admissions. The trial court denied the motion. Plaintiff at trial sought to read the deposition segments as part of her case without calling Weinberg as a witness. The trial court ruled that if plaintiff did so, the surgeons could call Weinberg to the stand immediately to explain his deposition answers. Plaintiff chose not to read the deposition excerpts as part of her case, using them instead to cross-examine Weinberg.

Dr. Weinberg testified at trial that the twitching and fever were evidence of a brain injury, and he gave a prophylactic dose of Dilan-

tin to prevent seizures by starting to build up the level of Dilantin in the blood in case Sheldon should need a full dose. The trial court also allowed Weinberg to testify that he and Dr. Eisenberg decided to consult with the neurologist Eisenberg preferred, and he did not know who contacted the neurologist. Plaintiff contends that the trial court should have confined Weinberg's testimony on these issues to his admissions in his deposition.

> "A judicial admission is a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's peculiar knowledge. [Citations.] Additionally, a party cannot create a factual dispute by contradicting a previously made judicial admission. *** [The] purpose of the doctrine of judicial admissions is to eliminate the temptation to commit perjury." *Hansen v. Ruby Construction Co.* (1987), 155 Ill. App. 3d 475, 480, 508 N.E.2d 301.

■ Whether Sheldon's twitches constitute evidence of seizure activity is not a fact peculiarly in Weinberg's knowledge; other experts had conflicting opinions on the issue. Moreover, Weinberg did not contradict his deposition testimony, he only qualified it to stress that the twitches did not constitute a full seizure, but they were, as he said in his deposition, "suggestive of seizure."

Similarly, Weinberg's trial testimony did not contradict his deposition testimony that he requested the consultation with Horwitz. No one asked him at his deposition whether he consulted Eisenberg regarding which neurologist to consult, or on what basis he chose Horwitz rather than other neurologists. Neither did plaintiff ask in the deposition whether he directly contacted Horwitz to request the consultation. The trial court committed no prejudicial error by refusing to declare binding judicial admissions. (See *Burns,* 237 Ill. App. 3d at 932.) Also, the court committed no error by ruling that if plaintiff read the statements into the record, the court would allow Weinberg to testify immediately after that reading to explain the testimony.

### III

At trial plaintiff presented expert testimony that the 12 grams of oxacillin Sheldon received in the course of the operation caused brain damage. Plaintiff's experts explained that the initial damage Sheldon suffered during surgery caused him to go into status epilepticus, and the failure to administer promptly a full dose of Dilantin or other anticonvulsants allowed the seizures to continue and led to his extensive brain damage.

The surgeons' experts said that small particles of debris, called microemboli, broke off from Sheldon's arteries during the operation

and lodged in his brain, causing the brain damage. The oxacillin, on this theory, had no causal relation to the brain damage. The brain damage Sheldon suffered during the surgery caused his seizures, which did not cause any further brain damage. The surgeons' experts said that the surgeons should not administer a full loading dose of anticonvulsants soon after heart surgery because such medications depress blood pressure and put greater stress on an already weak heart.

A. OPENING STATEMENT

The surgeons' attorney said, in opening argument, that the doctors

> "tore that operating room apart, the heart-lung machine apart to find if there was something in it. They did everything that they could at that time to see what it is that might cause this."

In chambers plaintiff moved for a mistrial on grounds that the opening statement referred to material to which plaintiff did not have access because the surgeons asserted, in discovery, that such investigations were privileged under the part of the Code of Civil Procedure pertaining to medical studies. (Ill. Rev. Stat. 1989, ch. 110, par. 8—2101 *et seq.*) The court denied the motion as premature because the court could not tell what evidence defendants might present to support their assertion. Defendants presented no evidence to support the statement. Plaintiff argues that, therefore, the trial court should have granted the motion for mistrial when plaintiff renewed it at the close of the evidence.

"[N]o statement should be made in counsel's opening statement to the jury which counsel *** cannot prove." (*Schwedler v. Galvan* (1977), 46 Ill. App. 3d 630, 640, 360 N.E.2d 1324.) The trial court should grant a mistrial "only when there is an occurrence of such character and magnitude as to deprive a party of a fair trial and the moving party demonstrates actual prejudice as a result." *Topp v. Logan* (1990), 197 Ill. App. 3d 285, 296, 554 N.E.2d 454.

■ Here, the surgeons never attempted to present evidence of the steps they took to eliminate mechanical misfunction or other possibilities arising in the operating room as causes of the brain damage. But plaintiff has not shown how she suffered actual prejudice as a result of the comment. Plaintiff presented evidence that 12 grams of oxacillin caused the brain damage, and each of defendants' witnesses fully explained why he or she did not believe that the oxacillin caused the brain damage. Since that was the only alternate causation theory for the brain damage arising in the operating room which plaintiff presented, defendants needed to rebut only that the-

ory, and the global statement that they eliminated all other possible sources occurring at the time of the operation has no impact on plaintiff's theory apart from the witnesses' reasons for rejecting that theory. The trial court did not abuse its discretion by denying the motion for mistrial. See *Allen v. Dhuse* (1982), 104 Ill. App. 3d 806, 811, 433 N.E.2d 356.

## B. PSYCHOLOGIST'S TESTIMONY

Jack Arbit, a clinical psychologist, testified for plaintiff that he evaluated tests performed on Sheldon seven months after the surgery. Sheldon's arithmetic score and his nonverbal performance fell in the "borderline mental defective range." His tests, evaluated in light of his prior achievements, indicated a "highly significant organic brain syndrome." Tests given a year later confirmed that evaluation and indicated that Sheldon was not likely to significantly improve in the future. Arbit believed that Sheldon no longer had the capacity to work as a bookkeeper, let alone as an accountant.

Plaintiff sought to question Arbit concerning the cause of the brain damage. Arbit has a doctorate in psychology, and appointments as a psychologist at Northwestern Memorial Hospital, Loyola Hospital, and St. Joseph Hospital. Much of his work concerns diagnosis of brain damage. He has evaluated patients both before and after heart surgery, and neurologists and physicians have asked him to determine causative factors in brain damage cases. In an offer of proof, Arbit stated that the cause of Sheldon's organic brain syndrome was "related to the surgery *** [and] it had to do with the presence of status epilepticus occurring post-surgery." He admitted that the psychological tests alone could not tell him how the brain damage occurred. He relied on the tests, hospital records and depositions of experts in forming his opinion. He did not know how a seizure, or status epilepticus, causes brain damage. The court disallowed the testimony regarding cause because plaintiff did not present "enough to indicate that this is within [Arbit's] field of expertise," and because "we don't put experts on just to give opinions of other experts." Plaintiff argues that this ruling constitutes reversible error.

The party offering an expert

"has the burden of establishing the expert's special knowledge, but the determination of the sufficiency of qualifications rests largely in the sound discretion of the trial court. [Citation.] The trial court's decision is subject to reversal only if it constitutes a gross abuse of discretion." *Tsai v. Kaniok* (1989), 185 Ill. App. 3d 602, 605, 541 N.E.2d 819.

■ Arbit explained that he based his causation opinion on the psychological tests, the medical record, and the depositions of other experts. He mirrored the opinion of plaintiff's other experts, who found that the status epilepticus caused the brain damage, although Arbit could not explain how the condition caused the damage. Arbit admitted that he could not distinguish possible causes on the basis of the psychological tests. The court found that Arbit was largely reciting the opinion of other experts, and plaintiff had not established that the opinion fell within Arbit's expertise.

Plaintiff cites *Valiulis v. Scheffels* (1989), 191 Ill. App. 3d 775, 547 N.E.2d 1289, as authority for finding the court's ruling erroneous. In that case a clinical psychologist testified that, in his opinion, based on the plaintiff's medical history and records, an automobile accident caused plaintiff's multiple sclerosis symptoms to appear, although the accident did not cause the disease itself. (*Valiulis*, 191 Ill. App. 3d at 782.) The appellate court affirmed judgment for plaintiff, finding no abuse of discretion in permitting the psychologist to give his expert opinion on cause. (*Valiulis*, 191 Ill. App. 3d at 786.) The psychologist in *Valiulis*, unlike Arbit, did not rely in any way on the opinions of other experts in forming his opinion. The psychologist did not concede that the psychological evidence provided no basis for distinguishing possible causes. The trial court here did not abuse its discretion by excluding Arbit's opinion on causation.

## C. RUSH ANTIBIOTIC HISTORY

The parties held discovery depositions of all named experts and other witnesses. Dr. Stuart Levin testified at his deposition that he asked Howard Peacock, a technician who operated a heart-lung machine at Rush, for information concerning heart operations at Rush for which patients received 12 grams of oxacillin as a prophylactic antibiotic. Peacock sent Levin a one-page document indicating the number of heart operations performed at Rush each year from 1964 to 1982, and indicating that oxacillin was the principal antibiotic used each of those years. The document indicated that various surgeons performed more than 10,500 heart operations at Rush in that time. Levin said that he relied on that information to support his opinion that the administration of 12 grams of oxacillin complied with the standard of care.

Plaintiff requested documents Peacock used as a basis for his summary. Peacock sent plaintiff about 8,500 documents which showed the antibiotics those 8,500 patients received at Rush during open heart surgery. The individual documents showed that different antibiotics were given to some patients, and other patients received

lesser dosages of oxacillin. Peacock at his deposition explained that he did not send documents for many of the patients included in the summary because the documents were unreadable.

Plaintiff moved to bar evidence concerning the history of antibiotic use at Rush. The trial court barred "defense experts from relying upon the summary of voluminous documents prepared by Howard Peacock," but it allowed defendants to present other evidence of the history of antibiotic usage for heart surgery at Rush.

Dr. Hassan Najafi, chair of the department of cardiovascular thoracic surgery at Rush, testified at trial that he knew personally that the cardiovascular surgery department at Rush established a regimen, used in the 1970's and early 1980's, of giving heart surgery patients 12 grams of oxacillin as the prophylactic antibiotic, unless the patients were allergic to penicillin.

Najafi co-authored a paper entitled "Neurological Complications of Coronary Revascularization," which summarized results of a study of all coronary bypass surgery patients at Rush from 1976 until 1981. The paper does not mention oxacillin because the authors did not believe that oxacillin caused any of the neurological complications patients in the study suffered. In the article, the authors found that, of 3,206 heart surgery patients at Rush in the period of the study, 32 suffered major neurological complications. The complication rate was less than 1%, which was a very good rate. If oxacillin were a cause of neurological complications, he would expect the complication rate in the study to exceed the acceptable level of 2% to 3%.

Dr. Monson testified that when he joined the cardiovascular surgery department at Rush in 1971 that department used 12 grams of oxacillin as a prophylactic antibiotic for cardiac surgery. He personally knew that from 1971 until 1982 all of the cardiac surgeons at Rush used oxacillin unless the patient had an allergy or some other factor prevented use of the drug in that quantity. He estimated that 85% of the cardiac surgery patients in that time received oxacillin. He would have found out about any post-surgical complications for any such patients in the department's monthly staff meetings. Using data from a Rush departmental report and Dr. Hassan Najafi's study, he estimated that surgeons performed about 8,000 heart operations at Rush from 1971 until 1982, and of those about 6,500 of the patients received 12 grams of oxacillin as a prophylactic antibiotic. Rush, over that period, had a complication rate for such operations of about 1%, which was lower than the national average.

Dr. Weinberg testified that the cardiovascular surgery department at Rush as a team adopted a regimen of using 12 grams of oxacillin as its standard prophylactic antibiotic. His attorney asked for

an estimate of the number of patients who underwent this regimen. He answered, over objection, that there was no indication Weinberg knew the number:

"The material that was shown in here earlier said there were about 8,000 patients. And of those about 15 percent *** received some other drug ***. But about 85 percent of that roughly 8,000 patients that were presented right here had 12 grams of [o]xacillin."

Plaintiff contends that the trial court should have barred all testimony concerning antibiotics used at Rush because the testimony was irrelevant and because the witnesses indirectly relied on Peacock's summary, in violation of the pretrial *in limine* order. Plaintiff also objects to the use of Dr. Najafi's study, which Najafi, Monson and Weinberg all relied on in support of their conclusions.

Plaintiff cites *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279, as authority showing that the evidence is irrelevant. In *Walski* our supreme court established that evidence that another doctor would have acted differently was not sufficient to show that the defendant doctor breached the standard of care. An expert's statements that he would have acted differently are not even relevant "because differences in opinion are consistent with conformity to the applicable standard." *Mazzone v. Holmes* (1990), 197 Ill. App. 3d 886, 898, 557 N.E.2d 186.

■ Defendants here sought to introduce testimony showing that other doctors, the surgeons at Rush, would have used the same treatment. An expert's regular use of a treatment is strong evidence that in that expert's opinion the treatment complies with the standard of care (see *Chiero v. Chicago Osteopathic Hospital* (1979), 74 Ill. App. 3d 166, 174, 392 N.E.2d 203), although it is not evidence that different treatment does not conform to the standard of care (*Walski*, 72 Ill. 2d at 261). The Rush antibiotic history, showing the use of 12 grams of oxacillin by all of its heart surgeons for a substantial period of time, is highly relevant evidence showing that defendant's use of that regimen fell within the applicable standard of care.

Plaintiff argues that testimony from both surgeons concerning antibiotic use at Rush should have been excluded because it was vague, lacking foundation, and indirectly dependent upon Peacock's summary. While an expert cannot base his opinion on "mere conjecture and guess" (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 244, 500 N.E.2d 8), he may rely on his own experiences and "firsthand observation." (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 193, 417 N.E.2d 1322.) No rule prevents witnesses from making estimates based on their observations. The surgeons here have made just such estimates,

supported partly by data in Najafi's study. Their testimony does not indicate any reliance on Peacock's summary.

Plaintiff also objects to Najafi's study as hearsay. Najafi testified to the basic results of the study of cardiac surgery patients at Rush, including the data that 32 out of 3,206 patients experienced severe neurological complications in the period studied. Generally, scientific studies are hearsay and not admissible to prove the statements therein. (*In re Estate of Dickens* (1987), 161 Ill. App. 3d 565, 573, 515 N.E.2d 208.) Najafi was an author of the study at issue here, and he adopted the data and the conclusions of the study as his testimony in court. His testimony in court does not become hearsay merely because it matches statements he made out of court. Najafi's recitation of the data and conclusions of his study is relevant and admissible evidence which the surgeons properly used as a basis for their testimonies.

## D. AUTOPSY

Plaintiff moved *in limine* to bar defendants from "referring to the absence of an autopsy of Sheldon Glassman or what an autopsy might have shown." The trial court sustained the motion, but the court held that the ruling was limited to the motion "as it is written." The court clarified that it was not "eliminating a question such as how does one diagnose that, as long as it is not directed to Sheldon Glassman specifically."

Dr. Weinberg testified that microemboli were the most likely cause of Sheldon's brain damage. He added:

"I cannot say that Mr. Glassman had any particular diagnosis. [The cause] didn't show on brain scan, which microemboli many times don't. You cannot give an individual patient a diagnosis under those circumstances simply because *** you don't do autopsies off brain sections on people who are getting by."

He said that only with an autopsy could one determine the cause of the damage for certain.

Dr. Horwitz testified that, in her opinion, diffuse microemboli damaged all areas of Sheldon's brain. She believed that microemboli disturbing his hypothalmus caused the loss of body temperature regulation, thereby causing the high fever. She could not pinpoint an exact cause for the brain damage because, short of an autopsy, no one could determine what embolic events occurred. She agreed that nobody was suggesting an autopsy.

■ Plaintiff claims that by allowing Dr. Weinberg and Dr. Horwitz to testify to the need for an autopsy, the trial court committed prejudicial error. "Whether evidence is admissible rests primarily in the discretion of the trial court and its decision will not be disturbed

absent an abuse of that discretion." (*Behrstock v. Ace Hose & Rubber Co.* (1986), 147 Ill. App. 3d 76, 81, 496 N.E.2d 1024.) Evidence that the doctors could not be certain of the diagnosis without an autopsy explains the level of certainty of their opinions. Both doctors avoided prejudicing plaintiff since both clarified that they were not suggesting an autopsy should have been done on Sheldon. The trial court did not abuse its discretion by allowing the testimony into evidence.

## E. VIDEOTAPE

Dr. Monson testified that in his opinion a shower of microemboli released during the operation injured Sheldon's brain. The court allowed Monson to present a videotape of other surgeons performing a very similar triple bypass surgery. Monson pointed out to the jury that he was not the surgeon on the tape, and Sheldon was not the patient. The court told the jury that the tape was just a demonstrative aid for better understanding the testimony. The tape shows the surgeons making the first incision into the chest, cutting through tissues to expose the heart and the aorta, stitching the tube from the heart-lung machine into the aorta and stitching the vena cava to allow insertion of catheters to drain blood from the heart. The surgeons on the tape handle blood vessels occluded with plaque, and Monson explained that the surgeon's cut into the aorta was a "source of potential breaking free of debris material from inside." The tape showed surgeons clamping the aorta and stopping the heart from beating so that they could dissect the heart's surface to repair a coronary artery. Monson explained that in attaching the vein from the leg to the artery, the heart is tipped up, by hand, to expose the back of the heart. He said, "[T]he more we move, the more these kind[s] of risks [of debris entering the bloodstream] become a possibility." The tape showed the surgeons opening a second coronary artery and removing plaque, then sewing the artery closed.

Plaintiff contends that the trial court committed reversible error by permitting defendants to show the jury a videotape of a coronary bypass procedure performed by different surgeons on a different patient. Videotapes may be shown if "their probative value is not outweighed by their inflammatory effect." (*Barenbrugge v. Rich* (1986), 141 Ill. App. 3d 1046, 1056, 490 N.E.2d 1368.) The trial court's ruling on use of videotapes will not be reversed absent an abuse of discretion. *Missouri Portland Cement Co. v. United Cement, Lime, Gypsum & Allied Workers International Union, Division of Boilermakers, AFL-CIO, Local No. 438* (1986), 145 Ill. App. 3d 1023, 1027, 496 N.E.2d 489.

In *Montag v. Board of Education, School District No. 40* (1983),

112 Ill. App. 3d 1039, 446 N.E.2d 299, the plaintiff sustained injuries in a gymnastics team practice session. Defendant showed a videotape of another practice session depicting the moves gymnasts like plaintiff made. The court held that the differences in the circumstances did not render the film inadmissible as long as the jury was not misled, stating:

"[T]he film was used to show the jury what the routines looked like and how they were performed. Up until the film's showing, the jurors were only given verbal descriptions and a few drawings which attempted to illustrate the various movements of the body in the routine. *** [T]he movie *** added a visual dimension that still pictures or oral testimony could never duplicate. Furthermore, just prior to the showing, the lower court admonished the jury that 'the film will be shown for the limited purpose of demonstrating the routine in question.' *** The trial court did not abuse its discretion in this matter." *Montag*, 112 Ill. App. 3d at 1047.

■ Here, as in *Montag*, the jury had heard verbal descriptions of the operation defendants performed to explain their theory that microemboli broke off in the manipulations of the aorta, heart and other vessels during the surgery, and these microemboli alone caused the brain damage. The videotape illustrated the manipulations better than oral testimony or drawings could. Monson pointed out each manipulation and cut which could cause particles inside the arteries to break off and enter the bloodstream. The court admonished the jury that the tape was only a demonstrative aid, and the surgeon told them that he was not the surgeon shown on the tape, so the jurors were not misled.

In *Glusaskas v. Hutchinson* (1989), 148 A.D.2d 203, 544 N.Y.S.2d 323, the plaintiff contended that the defendant performed a mitral valve replacement operation negligently. Defendant made a videotape of a coronary bypass surgery he performed on a different patient a few weeks before trial. The trial court permitted defendant to show the tape to the jury. The appellate court reversed judgment for the defendant, holding that the tape was an improper attempt by the doctor to show how careful he was in similar procedures. The court said:

"Although the use of an instructional film in a malpractice action might be justified under certain circumstances as where, for instance, an expert witness is demonstrating how a particular medical procedure is commonly carried out, such a film is surely inappropriate as a self-serving device prepared by a defendant specifically for introduction at a trial in order to disprove his negligence in an entirely separate surgery. Certainly, the videotape in question herein did not constitute relevant or

probative evidence of anything ***." *Glusaskas*, 148 A.D.2d at 209, 544 N.Y.S.2d at 326-27.

In this case, unlike *Glusaskas*, the videotape was relevant to defendant's theory, and the court and Dr. Monson clearly explained that the tape did not show the defendant performing surgery. The videotape was an instructional film used to show how a procedure is carried out, a use expressly distinguished in *Glusaskas* from the objectionable use the defendant made of the tape in that case. The trial court did not abuse its discretion by permitting defendants to show the videotape.

### F. EXPERT'S USE OF DIFFERENT ANTIBIOTICS

Dr. Thomas Murphy, an expert for the defense, testified that the post-operative treatment of Sheldon's fever met the standard of care, and the dosages of Dilantin fell within the accepted standard of care, given the patient's cardiac condition. In his opinion, microemboli released during surgery blocked brain arteries, causing a stroke. The brain injury caused the fever and the seizures. On cross, Murphy admitted that in 1979 he used cephalosporin as a prophylactic antibiotic for heart surgery. The court sustained defendant's objection. Plaintiff argues that this ruling was error.

■ Although the court may allow a broad scope for cross-examination of medical testimony (*Horwitz v. Michael Reese Hospital* (1970), 5 Ill. App. 3d 508, 516-17, 284 N.E.2d 4), the scope cannot be so broad as to overcome the fundamental principle that only that which is relevant is admissible (see *People ex rel. Noren v. Dempsey* (1957), 10 Ill. 2d 288, 293, 139 N.E.2d 780). An expert's testimony that he would have acted differently is not relevant to the standard of care. (*Mazzone*, 197 Ill. App. 3d at 898.) Neither is the fact that cephalosporin was in use at some hospitals years before the surgeons here began using it in heart operations relevant to any issues in the case. The trial court did not abuse its discretion by excluding this irrelevant testimony.

We note that the trial court properly permitted Dr. Murphy to testify on redirect that the administration of 12 grams of oxacillin was within the standard of care in 1979. This testimony helped cure any possible prejudice to defendants from the irrelevant testimony which the jury heard concerning Dr. Murphy's use of cephalosporin as a prophylactic antibiotic in 1979.

### G. EXPERT'S OPINION ON POST-OPERATIVE CARE

Dr. Najafi testified that in the article which he co-authored on neurological complications experienced at Rush, he concluded that the most common cause of such complications is

"dislodgement of a particulate from somewhere, either the heart or the aorta or even *** outside the patient but within the heart-lung machine[,] reaching the patient's brain, either one or many or multiple [particles] causing brain damage. We call this cerebral embolism."

He gave no opinion on direct examination concerning the cause of Sheldon's brain damage.

Plaintiff sought to cross-examine Najafi concerning care of post-operative seizures, although Najafi admitted that he had never treated post-operative seizures, and he was not an expert on seizures. The court sustained defendant's objection to the questions as beyond the scope of direct examination. The court also sustained objections to questions concerning the treatment of post-operative fevers.

██ Plaintiff contends that she should have been allowed to cross-examine Dr. Najafi concerning post-operative treatment of seizures. Defendants had not asked Najafi about post-operative treatment. On cross Najafi admitted that he had never treated post-operative seizures, and he was not an expert on their treatment. The court disallowed further questioning on the subject. The testimony plaintiff sought to educe from Najafi was not only beyond the scope of direct examination, it was outside the range of Najafi's expertise. The trial court did not abuse its discretion by limiting cross-examination. See *Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 518, 492 N.E.2d 1364.

## H. RULE 220

Dr. John Hughes testified for the defense that in his opinion microemboli caused Sheldon's seizures. Hughes defined status epilepticus as "continuous seizure activity for more than 30 *** minutes." Sheldon was never in status epilepticus because he did not have any individual seizure which lasted more than three minutes. Seizures that do not constitute status epilepticus are unlikely to cause brain damage. On cross he said he agreed with Treiman's definition of status epilepticus, that it can be a "series of convulsions occurring without recovery of consciousness during the intervals between attacks."

The surgeons asked Hughes whether Sheldon's seizures, by themselves, caused brain damage. Plaintiff objected, pointing out in chambers that in Hughes' deposition plaintiff's attorney asked:

"Can you *** [say] how much brain damage was done to Mr. Glassman after 7:30 p.m. on November 6, 1979?"

And Hughes then responded:

"I think it is impossible to give a percent. *** [A]ny emboli that

would have occurred have already occurred [by 7:30 p.m.] And as I indicated, I would think that the embolic phenomena themselves would be more important to explain the damage than the seizures themselves. *** [T]he 16 seizures that came after, that likely would have contributed to some extent toward the brain damage, but not as much as the emboli themselves."

Defendants had not given plaintiff notice of any change in Hughes' opinion. The trial court overruled plaintiff's objection that any different answer would violate Supreme Court Rule 220. At trial Hughes testified, "In my view, the seizures themselves *** did not cause brain damage." The court allowed plaintiff to present the inconsistent deposition testimony on cross-examination.

Rule 220(d) provides:

"To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through *** depositions ***, his direct testimony at trial may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings." 134 Ill. 2d R. 220(d).

In *Lee v. Ingalls Memorial Hospital* (1992), 238 Ill. App. 3d 154, 606 N.E.2d 160, the plaintiff's expert testified at his deposition that the drug administered by the hospital was not "any part of a mechanism of injury." (*Lee*, 238 Ill. App. 3d at 159.) At trial plaintiff sought to connect the administration of the drug to the injury by the expert's testimony that the drug's effects caused a doctor to need to apply excessive force in using forceps, and this force caused the injury. The trial court excluded the testimony and the appellate court affirmed, finding that the proposed trial testimony was contrary to the deposition testimony. *Lee*, 238 Ill. App. 3d at 160-61.

▇ Hughes' testimony at trial similarly contradicted his deposition testimony, and, therefore, the trial court should have excluded it. However, the error is grounds for reversal only if it had prejudicial effect on the verdicts. (*Karr v. Noel* (1991), 212 Ill. App. 3d 575, 583-84, 571 N.E.2d 271.) The jury's verdict in favor of the surgeons shows that it found either that the surgeons were not negligent or that their negligence caused no injury. The jury considered against the hospital charges related only to post-operative care; since it found the hospital liable, the jury must have found that some aspect of post-operative care injured plaintiff. The jury's verdict is consistent only if it found that the surgeons' post-operative treatment met the standard of care, but the nurses' conduct did not, and the nurses' failings caused injury. Dr. Hughes' improper testimony does not concern the surgeons' acts or the standard of care; it relates only to

causation, but the verdict for the surgeons rests on the finding that their post-operative care was not negligent, not on any finding regarding cause. Without Hughes' testimony, the jury still would have concluded that the surgeons were not negligent and therefore not liable. Thus, the Rule 220 violation apparently could not have had any prejudicial effect on plaintiff's case against the surgeons, and therefore it is not grounds for reversing the judgment in their favor.

The jury awarded plaintiff almost $52,000 from the hospital, so the jury must have found that the nurses' negligence caused part of Sheldon's injuries. Dr. Hughes' improper testimony was evidence that the nurses' conduct, even if negligent, caused no brain damage. The jury's award of almost $52,000 in damages indicates that the jury believed the negligence caused part of the brain damage. This conclusion is consistent with Hughes' deposition testimony, which the trial court properly admitted here, that the seizures themselves caused some part of the brain damage, but most of the brain damage had already occurred due to the shower of microemboli which must have ended before the first negligent acts of the nurses. Since the jury rejected the improper testimony and made findings consistent with Hughes' properly admitted testimony, we find that plaintiff suffered no prejudice from the trial court's decision to allow Hughes to give testimony inconsistent with his deposition testimony, in violation of Rule 220.

## I. CLOSING ARGUMENT

On cross-examination Dr. Celesia admitted that the anesthetic used on Sheldon, enflurane, is a possible epileptogenic agent. In closing the surgeons' attorney argued:

> "[W]hy didn't [plaintiff's attorneys] look at enflurane? Why did they concentrate on [o]xacillin? Only because the cardiac surgeons are left here to hold the bag."

Plaintiff objected and the court said, "All right. Overruled." The attorney also said:

> "All of the doctors, Eisenberg, Heller, Kleiman, the cardiologists, the neurologist, Dr. Monson, Weinberg, even the anesthesiologist who was seeing the patient all came to the same conclusion. *** No one suggested *** there was something wrong with the medication we gave to the patient."

Plaintiff objected that neither Heller nor the anesthesiologist testified. The court said only, "All right." The court never expressly ruled on the objection.

No evidence supports defense counsel's assertions concerning conclusions Heller and the anesthesiologist reached. The assertion

that plaintiff did not investigate the possibility that the anesthesiologist's use of enflurane caused the brain damage is directly contrary to pretrial facts the defense knew about plaintiff's efforts to sue the anesthesiologist, and the defense knew that the jury had not seen the evidence that plaintiff investigated this possibility. Misstatements of the evidence and deliberate efforts to mislead the jury are highly improper, and they are grounds for reversal if the aggrieved party "can show prejudice resulted so as to deny a fair trial." *Rutledge v. St. Anne's Hospital* (1992), 230 Ill. App. 3d 786, 791, 595 N.E.2d 1165.

■ We find that the trial court erred by failing to sustain plaintiff's well-founded objections to closing argument. However, we cannot say that the remarks deprived plaintiff of a fair trial. Eisenberg, Kleiman, the surgeons and the neurologist all testified that the use of oxacillin complied with the standard of care and did not cause Sheldon's brain damage. The inclusion of Heller and the anesthesiologist in the list added negligibly to the weight of the argument. The comment on enflurane also had little bearing on the issues for the jury: if the jurors believed plaintiff's evidence that oxacillin could cause brain damage, they would not likely be swayed by a passing comment, supported by no substantial evidence, that another drug might have some related effect. We find that the erroneous failure to sustain plaintiff's objections to closing argument, standing alone, cannot justify reversal here.

## J. INSTRUCTIONS

### 1. REFUSAL TO INSTRUCT ON TWO OF PLAINTIFF'S THEORIES

Dr. Arthur Roberts, a cardiac surgeon, testified as plaintiff's expert on the surgeons' post-operative treatment of Sheldon. Plaintiff asked if adequate measures were taken to reduce the fever. Roberts answered:

"[T]he measures taken *** included very acceptable measures.

Tylenol, a drug to bring fever down.

A cooling blanket to bring fever down.

Thorazine, another medicine that can help to bring fever down.

\* \* \*

The unfortunate thing is in this case what was done didn't work, didn't bring the fever down, didn't slow down or stop the seizure disorder in a sufficiently short period of time to minimize or prevent potential worsening of damage that was occurring."

In his opinion the surgeon "should do everything possible to bring down a fever in the range of 105 or 106 degrees."

Plaintiff asked if the operating surgeon remained responsible for the patient for the first eight hours after surgery. Roberts explained:

"In general, the cardiac surgeons work as teams.

\*\*\*

So it's common practice that any member of the team would be accepted as a responsible cardiac surgical member to take care of the patient postoperatively.

And, in general, the groups of cardiac surgeons split, divide those responsibilities. .

\*\*\*

So in this case, the fact that one surgeon \*\*\* was the primary surgeon, but another surgeon was primarily responsible for following the patient in the early postoperative period is \*\*\* a standard practice."

At the close of the evidence the court sustained the surgeons' motion for directed verdict on the charge that they failed to institute adequate measures to reduce Sheldon's fever. The trial court also directed a verdict for Monson on all charges except the negligent use of too high a dose of oxacillin. The court refused plaintiff's proposed issues instruction asking the jury to find Monson responsible for the post-operative care, and to find Dr. Weinberg liable for failure to reduce the fever. Plaintiff now objects to both rulings.

■ Plaintiff's sole expert witness on the standard of care for supervision of post-operative treatment and for treatment of the fever was Dr. Roberts. He said that the surgeon remained responsible for post-operative treatment, but he explained that in accord with the standard of care, the primary surgeon would often leave the care of the patient in the hands of any responsible member of the surgical team. Monson left Sheldon in Weinberg's care, in full compliance with the standard of care. Since plaintiff presented no evidence that to meet the standard of care Monson needed to do any further supervision, the trial court correctly directed a verdict for Monson on all issues related to post-operative treatment. (See *Walski*, 72 Ill. 2d at 256, 262.) Accordingly, the trial court correctly refused to instruct the jury on the theory that Monson violated the standard of care for post-operative treatment.

Roberts also said that the measures Weinberg took to control the fever were appropriate. He added that the measures unfortunately did not work, and the surgeon should do everything possible to bring the temperature down. He did not specify what further measures were necessary for compliance with the standard of care, nor did he specifically testify that Weinberg's treatment violated the standard of care. Again, the evidence supports the trial court's decision to

grant the motion for directed verdict, and the consequent decision to refuse the related issues instruction.

## 2. MISSING WITNESSES

Although defendants named Dr. Lawrence Michaels, Dr. Sandra Olson and Dr. Kenneth Fisher as their experts, they did not call them to testify. The witnesses were a cardiovascular surgeon and two neurologists, who were to testify that the surgical and the neurological treatment met the standard of care in 1979. Plaintiff requested the missing witness instruction (Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971) (IPI Civil 2d No. 5.01)), so that plaintiff could argue that defendants' failure to call those witnesses indicated they would give testimony unfavorable to defendants. The court refused the instruction.

The trial court should give the missing witness instruction if the court

> "makes a preliminary determination that a party, in all likelihood, would have produced a witness or evidence unless that witness or evidence was unfavorable to it. [Citation.] The instruction allows a jury to draw an adverse inference from a party's failure to offer evidence or to produce a witness when: (1) the evidence or witness is under his control and could have been produced through reasonable diligence; (2) the other party did not have equal opportunity to obtain the evidence or witness; (3) the evidence or witness would have been produced if it were favorable; and (4) the party has offered no reasonable excuse for his failure to produce. [Citation.] The giving of this instruction is in the trial court's discretion, and the appellate court will reverse only upon a showing of clear abuse of discretion. [Citation.] The instruction, however, is not given when the omitted testimony of the missing witness would have been merely cumulative." *Myre v. Kroger Co.* (1988), 176 Ill. App. 3d 160, 165, 530 N.E.2d 1122.

■ The trial court refused the instruction because defendants presented other witnesses who testified that surgical and neurological treatment met the standard of care in 1979. Defense counsel also argued that defendants did not wish to prolong the already very lengthy trial with more witnesses. Since counsel presented reasonable excuses for the failure to produce the witnesses, and the omitted testimony would have been largely cumulative, the trial court did not clearly abuse its discretion by refusing to give IPI Civil 2d No. 5.01.

## 3. MISSING EVIDENCE

■ Plaintiff sought the missing evidence pattern instruction

because defendants did not prove the statement made in opening that the doctors "tore that operating room apart" looking for possible causes of the brain damage. Although the trial court refused the instruction, the court told plaintiff that she could argue in closing that defendants failed to prove that claim. We found above that the missing evidence was relatively unimportant, bearing only marginally on the issues in this case. The trial court did not abuse its discretion by refusing to give the missing evidence instruction.

### 4. LIABILITY AS PARTNERS

■ Plaintiff proposed both IPI Civil 2d No. 50.12 and a modification of that instruction, based on her theory that the surgeons were liable as partners for each other's conduct. The court refused both instructions. Since the jury found that neither surgeon was liable, failure to give these instructions could not have had any prejudicial effect, and therefore it cannot constitute reversible error.

### 5. LIABILITY FOR DR. HORWITZ

Plaintiff offered three non-IPI instructions which the court refused, all pertaining to defendants' liability for damages including those caused by Dr. Horwitz's allegedly negligent acts. The first read:

"If you find for the plaintiffs against one or both of the defendants, it is not a defense that a lack of care by a physician may have aggravated the injury. The law regards an injury which is aggravated by the care of a physician as a part of the immediate and direct damage[s] which flow from the injury."

The second stated that a doctor "cannot avoid liability which he would otherwise have for aggravation of injuries to his patient, if any, on the ground that it was caused by a negligent act of a later treating physician." The third similar instruction, which plaintiff presented as a non-IPI instruction although it appears to be a modification of IPI Civil 2d No. 12.04, read:

"If you believe that one or more of the defendants were negligent and that their negligence caused injury to the plaintiff, it is not a defense that some other defendant or some third person may also have been to blame."

The court rejected the three instructions and instead instructed the jurors only that if they found for plaintiff against either defendant, they must fix the amount which will compensate plaintiff for damage "proved by the evidence to have resulted from the negligence of the defendant." IPI Civil 2d No. 32.01.

"The trial court has the discretion to determine which instruction shall be given, and the exercise of such discretion will not be

disturbed on review unless it has been clearly abused. [Citations.] The standard for determining the adequacy of jury instructions is whether they were sufficiently clear to avoid misleading the jury, while at the same time fairly and correctly stated the law. [Citations.] However, care should be taken to prevent instructions overemphasizing any particular matter. [Citations.] Finally, a particular jury instruction given by the trial court is proper if it is supported by some evidence in the record, and the trial court has discretion in deciding which issues are raised by the evidence. [Citation.]

\* \* \*

\*\*\* A reviewing court will ordinarily not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1087-88, 560 N.E.2d 969.

In *Wood v. Mobil Chemical Co.* (1977), 50 Ill. App. 3d 465, 365 N.E.2d 1087, the defendant presented evidence that plaintiff's subsequent medical treatment was negligent and that negligence aggravated the injury. The trial court gave one of the non-IPI instructions plaintiff proposed here, telling the jury that

"it is not a defense that a lack of care by a physician may have aggravated the injury. The law regards an injury which is aggravated by the care of a physician as a part of the immediate and direct damage[s] which flow from the injury." (*Wood*, 50 Ill. App. 3d at 475.)

The appellate court affirmed judgment for plaintiff, holding that the instruction properly stated the law and answered defendant's argument.

In *Dickeson v. Baltimore & Ohio Chicago Terminal R.R. Co.* (1965), 73 Ill. App. 2d 5, 220 N.E.2d 43, *aff'd* (1969), 42 Ill. 2d 103, 245 N.E.2d 762, although defendants never argued that the injury resulted from a nonparty's negligence, the trial court gave the modified IPI instruction which plaintiff proposed here, stating:

"If you believe that one or more of the defendants were negligent and that its negligence caused injury to the plaintiff, it is not a defense that \*\*\* some third person may also have been to blame." (*Dickeson*, 73 Ill. App. 2d at 34.)

The appellate court affirmed judgment for plaintiff, finding that the jury could have thought a nonparty's negligence contributed to the injury, although defendants did not argue for that result.

■ The jury here could have believed that Dr. Horwitz's negligence contributed to Sheldon's injuries. Under *Dickeson*, the trial court could have given the modified IPI instruction plaintiff proposed. However, the court instructed the jury to award plaintiff

all damages resulting from defendants' negligence, and defendants did not argue that Horwitz was negligent or that they should not be liable for the extent to which her conduct aggravated the damages. The refusal of the instruction is not a clear abuse of discretion.

K. CUMULATIVE ERROR

■ We find trial error only in the court's refusal to restrict Dr. Hughes' testimony, and in the failure to sustain plaintiff's appropriate objections to closing arguments. Considering these errors cumulatively, we find that they are not so substantial as to require reversal. *Cf. Rutledge,* 230 Ill. App. 3d at 795.

IV

Plaintiff contends on appeal that she is entitled to a new trial against the hospital limited to the issue of damages, because the jury ignored proven elements of damages. Dr. Treiman testified for plaintiff that Sheldon first suffered brain damage between 3:30 p.m. and 7:30 p.m. on November 6, 1979, but Treiman could not quantify the extent of the damage he suffered at that time. Dr. Celesia also admitted that Sheldon sustained major neurological deficits between 11 a.m. and 4:15 p.m. on November 6, 1979, but he said, "I cannot tell for sure when [damage occurred] because I am not God." Both Celesia and Treiman testified that the seizures Sheldon suffered later on November 6, and those on November 7 and 8, contributed to the brain damage.

Drs. Monson, Weinberg and Murphy all testified that in their opinions, a shower of microemboli released during surgery caused brain damage which in turn led to Sheldon's seizures. Dr. Weinberg testified that Sheldon's brain had suffered a significant injury by 4:25 p.m. on November 6, 1979. Dr. Hughes in his deposition, as brought out on cross-examination at trial, said that the microemboli alone caused most of the brain damage, and the continuing seizures afterward contributed to some lesser extent to the brain damage.

The jury expressly found the hospital negligent, and it found that the negligence injured plaintiff. The jury awarded plaintiff $1,764 for medical expenses and $50,000 for pain and suffering, but the jury awarded plaintiff nothing for disability, lost earnings or loss of companionship. Defendants agreed with plaintiff that Sheldon suffered brain damage which left him incapable of working as an accountant, and plaintiff paid medical bills in excess of $17,000, mostly for rehabilitation from the brain damage.

The trial court, using IPI Civil 2d No. 30.01, instructed the jurors that if they found any defendant liable to plaintiff, they must fix the

amount of money necessary to compensate plaintiff for damages "proved by the evidence to have resulted from the negligence of the defendant." This phrase, from the plaintiff's instruction, properly reflected the basic principle that "a plaintiff is entitled to damages for all injuries that are proximately caused by a defendant." (*Lewis v. Jones* (1987), 157 Ill. App. 3d 327, 331, 510 N.E.2d 157.) The amount of damages is generally within the discretion of the jury, and a reviewing court will order a new trial on grounds of inadequate damages only if "the damages awarded are manifestly inadequate or it is clear that proved elements of damages have been ignored or the amount of the award bears no reasonable relationship to the loss suffered" due to defendant's negligence. (*Elliott v. Koch* (1990), 200 Ill. App. 3d 1, 10, 558 N.E.2d 493.) This court "will not substitute its judgment for that of the jury *** unless there is a lack of a reasonable basis for the verdict shown in the record." (*Hernandez v. Lukas* (1982), 104 Ill. App. 3d 692, 694, 432 N.E.2d 1028.) However, if "the evidence is susceptible to no reasonable inferences sustaining a jury's verdict," this court may order a new trial. *Doubet v. Morgan* (1984), 122 Ill. App. 3d 431, 433, 461 N.E.2d 62.

■ Since the jury awarded plaintiff nothing for lost earnings or disability, both of which are clear consequences of Sheldon's brain damage, the jury apparently found that the hospital's negligence did not cause most of Sheldon's brain damage. Similarly, the medical expenses awarded plaintiff appear to exclude most of the expenses related to rehabilitation from brain damage.

The evidence can support these findings. The jury considered only four allegations of negligence against the hospital: the nurses failed to take Sheldon's temperature as often as ordered, failed to put on the cooling blanket in a timely manner, failed to administer phenobarbital as Horwitz ordered, and failed to notify doctors of the seizures overnight. The jury could have found for the hospital on the first two charges, which relate to conduct before 4 p.m. on November 6, 1979, and found that the nurses' first negligent acts occurred after 10 p.m. that evening. The surgeons' experts consistently testified that the surgeons at all times met the applicable standard of care. Thus, the jury could conclude that the defendants committed no negligent acts prior to 10 p.m.

Defense experts said that most of the brain damage occurred either during or shortly after the surgery, before Weinberg saw first signs of possible seizure activity at 4 p.m. on the day of surgery. Both Celesia and Treiman, plaintiff's experts, agreed that brain damage had begun by that time, although they testified that subsequent negligent acts aggravated that damage. Neither Celesia nor Treiman

attempted to quantify the amount of damage which had occurred by 4 p.m. Thus, the evidence can support a finding that Sheldon had already suffered most of his brain damage by 4 p.m. on the day of surgery. Since the nurses first acted negligently around 10 p.m., the jury could conclude that negligence contributed only marginally to Sheldon's brain damage.

The brain damage Sheldon suffered prior to the negligent acts after 10 p.m. may have been sufficient to render him incapable of working as an accountant, effectively as disabled as he proved to be, and in need of virtually all of the medical services for rehabilitation from brain damage that he eventually needed. If the jurors found that much brain damage may have occurred before the first negligent acts, they would appropriately conclude that plaintiff did not prove that the negligence caused that part of the brain damage.

This finding would not require the jury to return a verdict for the hospital on liability. Both Treiman and Celesia testified that the failure to call the doctors and take further measures to stop the seizures which occurred overnight contributed to Sheldon's injuries by making the seizures even harder to stop later. Celesia specifically answered that the failure to notify physicians caused injury because Sheldon kept having seizures. Both Treiman and Celesia said that doctors should have taken further measures to stop the seizures which occurred overnight. The jury could have concluded that the nurses' negligent failure to notify prevented doctors from taking such measures, causing Sheldon to continue having seizures throughout November 7 and into November 8, 1979. The fact that Dr. Horwitz and Dr. Weinberg said that they would have taken no further measures if notified has no bearing on this issue: the jurors could have disbelieved that testimony, or they could have decided that such a failure would have been negligent, but they could not assess damages against Dr. Weinberg for such negligence since the nurses deprived him of the opportunity to make that negligent decision.

Plaintiff argues that Sheldon's brain damage is an indivisible injury for which, if the jury found that the hospital's conduct contributed in any way to the injury, the jury must assess damages against the hospital for the entire loss Sheldon and plaintiff suffered due to the brain damage. Although plaintiff cites no law in support of this argument, we address it here because of the importance of the issue.

Our supreme court adopted section 433A of the Restatement (Second) of Torts (1965) in *Burke v. 12 Rothschild's Liquor Mart, Inc.* (1992), 148 Ill. 2d 429, 438, 593 N.E.2d 522. That section provides:

> "(1) Damages for harm are to be apportioned among two or more causes where

(a) there are distinct harms, or

(b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes." Restatement (Second) of Torts § 433A (1965). The commentators explained:

"[A]pportionment may be made where a part of the harm can fairly be assigned to an innocent cause, as where the defendant's dam or embankment combines with an unprecedented and unforeseeable rainfall to flood the plaintiff's land, and it is clear that a part of the flood would have resulted in any event from the rainfall alone. Apportionment may also be made where a part of the harm caused would clearly have resulted from the innocent conduct of the defendant himself, and the extent of the harm has been aggravated by his tortious conduct. There may also be apportionment between harm which results from a pre-existing condition, for which the defendant is no way responsible, and the further harm which his tortious conduct has caused." (Restatement (Second) of Torts § 433A, Comment *e* (1965).)

Although apportionment of flood damages to that which would have occurred without negligence, in the commentators' example, is necessarily inexact and based partly on conjecture, the Restatement supports a rough apportionment of damages between the innocent cause and the negligent cause.

Similarly, in W. Keeton, Prosser & Keeton on Torts § 52, at 345-49 (5th ed. 1984), the authors observe that where two tortfeasors have harmed a plaintiff, courts are likely not to apportion the damages, instead holding each tortfeasor liable for the entire amount of damages resulting from the torts. By contrast:

"The same kind of apportionment is, however, entirely possible where some part of the damage may reasonably and conveniently be assigned to an innocent cause. *** In such cases the weight of authority holds that the defendant is liable only for such portion of the total damage as may properly be attributed to the defendant's negligence." W. Keeton, Prosser & Keeton on Torts § 52, at 349 (5th ed. 1984).

The jury here apparently attributed most of the brain damage to microemboli released during surgery without any negligence on the part of defendants, which is an innocent cause of injury. The jury then apportioned to the hospital liability for only that part of the brain damage which resulted from the nurses' negligence, using expert testimony as a rough guide for apportioning the damages. This apportionment accords with the fundamental principles underlying section 433A. The brain damage here does not constitute an indivisible injury.

If the jury found that the seizures caused some marginal aggravation of Sheldon's brain damage which preexisted the negligent acts, the jury could have awarded plaintiff $50,000 for the increase in suffering due to the additional brain damage caused by the continued seizures. Similarly, the award of about 10% of the proved medical expenses would be an appropriate award for the aggravation of the brain damage. Since the award of damages may be an appropriate assessment of the damages caused by the hospital's negligence, the record provides a reasonable basis for the jury's verdict. Plaintiff has not shown that she is entitled to a new trial on the grounds of inadequate damages. See *Hernandez*, 104 Ill. App. 3d at 694.

Neither can plaintiff meet the other requirements for a new trial on damages only. Such new trials are appropriate only if the questions of liability and damages are so separate and distinct that a trial on damages only is not unfair. (*Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 46, 139 N.E.2d 275.) Here, the precise acts for which the hospital is to be held liable are crucial to determining the extent of its liability: if the hospital was negligent at 2 p.m., it may have contributed to much greater damage than its acts at 10 p.m. could have caused. The question of liability and damages are here inextricably intertwined. Since a limited retrial might be prejudicial to the hospital, the trial court did not abuse its discretion by refusing the request for a retrial on damages only. See *Deike v. Sears, Roebuck & Co.* (1983), 112 Ill. App. 3d 747, 749, 445 N.E.2d 1258.

The trial court's erroneous rulings were not so substantial as to deny plaintiff a fair trial, and the trial court did not abuse its discretion by denying the motion for new trial on damages only. The trial court correctly denied the hospital's motion for judgment notwithstanding the verdict. Accordingly, the judgment of the trial court is affirmed.

Affirmed.

DiVITO, P.J., and HARTMAN, J., concur.